## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HONG YI MO, derivatively on behalf of RAYTHEON TECHNOLOGIES CORPORATION f/k/a RAYTHEON COMPANY, | **C.A. No.** |
| Plaintiff, | |
| vs. | **DEMAND FOR JURY TRIAL** |
| THOMAS A. KENNEDY, ANTHONY F. O'BRIEN, MICHAEL J. WOOD, TRACY A. ATKINSON, ROBERT E. BEAUCHAMP, ADRIANE M. BROWN, VERNON E. CLARK, STEPHEN J. HADLEY, LETITIA A. LONG, GEORGE R. OLIVER, DINESH C. PALIWAL, ELLEN M. PAWLIKOWSKI, WILLIAM R. SPIVEY, MARTA R. STEWART, JAMES A. WINNEFELD, JR., and ROBERT O. WORK, | |
| Defendants, | |
| and | |
| RAYTHEON TECHNOLOGIES CORPORATION f/k/a RAYTHEON COMPANY, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Hong Yi Mo ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Raytheon Technologies Corporation f/k/a Raytheon Company ("Raytheon" or the "Company"), files this Verified Shareholder Derivative Complaint against Thomas A. Kennedy ("Kennedy"), Anthony F. O'Brien ("O'Brien"), Michael J. Wood ("Wood"), Tracy A. Atkinson ("Atkinson"), Robert E. Beauchamp ("Beauchamp"), Adriane M. Brown

1

("Brown"), Vernon E. Clark ("Clark"), Stephen J. Hadley ("Hadley"), Letitia A. Long ("Long"), George R. Oliver ("Oliver"), Dinesh C. Paliwal ("Paliwal"), Ellen M. Pawlikowski ("Pawlikowski"), William R. Spivey ("Spivey"), Marta R. Stewart ("Stewart"), James A. Winnefeld, Jr. ("Winnefeld"), and Robert O. Work ("Work") (collectively, the "Individual Defendants," and together with Raytheon, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Raytheon, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Raytheon, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Raytheon's directors and officers from February 10, 2016 through the present (the "Relevant Period").

2.      Raytheon is a Massachusetts-based global provider of high technology products and services to the aerospace industry, specializing in defense and other government markets

throughout the world. Among the Company's four main operational divisions is its Raytheon Missiles & Defense segment, which designs, develops, integrates, and produces missile and combat systems for the armed forces of the United States and allied nations.

3.    The Company, which was founded in 1922, and has grown internally and through a number of joint ventures, mergers and acquisitions since. The Company recently changed its name from Raytheon Company after merging with a high technology production and service provider, United Technologies Corporation ("UTC")[1] (the "Merger"). UTC was founded in 1934. The Company's common stock began publicly trading on the New York Stock Exchange ("NYSE") in early April 2020 under a new ticker symbol, "RTX." Prior to the Merger, Raytheon's common stock traded under the ticker symbol "RTN."

4.    In 2001, the Company formed a joint venture ("TRS") with Thales Group ("Thales"), a French aerospace and defense company that provides fully customized solutions through the integration of command and control centers, radars and communication networks.

5.    In 2019, Raytheon received a subpoena from the SEC seeking information into whether improper payments were made by TRS, or anyone acting on TRS's behalf, in connection with TRS or Raytheon contracts in certain Middle East countries (the "SEC Investigation"). Thereafter, the Company received a second subpoena from the SEC in connection to business dealings at TRS. In early 2020, the U.S Department of Justice ("DOJ") opened a parallel investigation (the "DOJ Investigation").

6.    Throughout the Relevant Period, in order to conceal "improper payments" to secure contracts in certain Middle Eastern countries, the Individual Defendants caused the Company to engage in improper accounting practices. Moreover, throughout the Relevant Period, the

---

[1] References herein to the Company, Raytheon, and Raytheon Company are used interchangeably.

Individual Defendants enabled Company insiders to unjustly enrich themselves to the detriment of the Company and its shareholders.

7.      During the Relevant Period, the Individual Defendants repeatedly, misleadingly attested to the accuracy of the Company's accounting treatment of Raytheon's operating costs, among other things, and affirmatively represented to the investing public that Raytheon maintained effective internal and disclosure controls and that the Company's SEC filings were full and accurate.

8.      The truth emerged on October 27, 2020, when Raytheon filed its quarterly report for the fiscal quarter ended September 30, 2020 on Form 10-Q (the "3Q20 10-Q"). The 3Q20 10-Q revealed that the DOJ had issued a criminal subpoena to Raytheon in connection with the DOJ Investigation seeking documents relating to financial accounting, internal controls over financial reporting, and cost reporting regarding Raytheon's Missiles & Defense business since 2009.

9.      On this news, the price of the Company's stock fell from $56.53 per share at the close of trading on October 27, 2020, to $52.34 per share at the close of trading on October 28, 2020, representing a loss in value of $4.19 per share, or over 7.4%.

10.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to engage in improper accounting practices, and by personally making and/or causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company failed to maintain adequate disclosure controls and procedures and failed to maintain internal controls over financial reporting; (2) the Company's financial accounting methods were defective; (3) consequently, the

Company failed to appropriately report Raytheon's expenditures relating to the Company's Missiles & Defense business since, at least, 2009; (4) accordingly, the Company was subjected to a heightened risk for governmental scrutiny; and (5) thus, the DOJ would commence a criminal investigation into Raytheon. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12.     Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

13.     Furthermore, during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase millions of shares of its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while seven of them engaged in lucrative insider sales, netting combined proceeds of over $37 million. Approximately 24,263,696 shares of the Company's common stock were repurchased during the Relevant Period for over $4.0 billion. As the Company's stock was actually only worth $52.34 per share during that time, the price at closing on October 28, 2020, the Company overpaid by nearly $2.7 billion in total.

14.     In light of the Individual Defendants' misconduct, which has subjected the Company, its Executive Chairman and former Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its Corporate Vice President and Controller and former Chief Accounting Officer ("CAO") to a federal securities fraud class action lawsuit pending in the United

States District Court for the District of Arizona (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, including through overpayment for stock through repurchases, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the former CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Raytheon's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this District because Raytheon is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

<b><u>PARTIES</u></b>

**<u>Plaintiff</u>**

20.     Plaintiff is a current shareholder of Raytheon. Plaintiff has continuously held Raytheon common stock at all relevant times.

**<u>Nominal Defendant Raytheon</u>**

21.     Raytheon is a Delaware corporation with its principal executive offices at 870 Winter Street, Waltham, Massachusetts 02451. Raytheon's shares trade on the NYSE under the ticker symbol "RTX." Prior to April 3, 2020, the Company's stocks traded on NYSE under the ticker symbols "RTN."

**<u>Defendant Kennedy</u>**

22.     Defendant Kennedy has served as the Company's Executive Chairman since the Merger in April 2020. He also serves as a member of the Finance Committee and as a member of the Special Activities Committee. Prior to the Merger, he served as the Company's CEO since 2014, Chairman since October 2014, and director since January 2014. Previously, he served in various leadership roles at the Company including as the Company's Executive Vice President and Chief Operating Officer ("COO") from April 2013 until March 2014, Vice President and President of the Integrated Defense Systems business unit from 2010 until 2013, Vice President of the

Tactical Airborne Systems product line within the Company's Space and Airborne Systems business unit from 2007 until 2010, and as a Company director since January 2018. According to an amendment to the Company's annual report for the fiscal year ended December 31, 2019 filed on Form 10-K/A with the SEC on April 1, 2020 (the "2019 10-K/A"), as of February 29, 2020, Defendant Kennedy beneficially owned 153,212 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $82.18, Defendant Kennedy owned nearly $12.6 million worth of Raytheon stock.

23.     For the fiscal year ended December 31, 2019, Defendant Kennedy received $16,561,765 in compensation from the Company. This included $1,540,864 in salary, $4,520,900 results-based incentive compensation, $6,299,954 long-term performance plan compensation, and $4,200,047 in restricted stock awards. For the fiscal year ended December 31, 2018, Defendant Kennedy received $16,347,610 in compensation from the Company. This included $1,511,559 in salary, $4,336,000 results-based incentive compensation, $5,800,075 long-term performance plan compensation, and $4,699,976 in restricted stock awards. For the fiscal year ended December 31, 2017, Defendant Kennedy received $14,737,244 in compensation from the Company. This included $1,403,211 in salary, $3,434,000 results-based incentive compensation, $5,499,988 long-term performance plan compensation, and $4,400,045 in restricted stock awards. For the fiscal year ended December 31, 2016, Defendant Kennedy received $13,138,387 in compensation from the Company. This included $1,299,979 in salary, $2,938,400 results-based incentive compensation, $5,000,028 long-term performance plan compensation, and $3,899,980 in restricted stock awards.

24.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kennedy made the following sales of Company stock:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| March 24, 2016 | 11,569 | $123.57 | $1,429,581.33 |
| June 6, 2016 | 13,858 | $133.82 | $1,854,477.56 |
| February 16, 2017 | 36,682 | $151.53 | $5,558,423.46 |
| March 24, 2017 | 5,422 | $152.29 | $825,716.38 |
| June 5, 2017 | 10,703 | $162.32 | $1,737,310.96 |
| February 15, 2018 | 44,778 | $216.12 | $9,677,421.36 |
| March 23, 2018 | 5,688 | $213.93 | $1,216,833.84 |
| March 29, 2018 | 6,076 | $213.83 | $1,299,231.08 |

Thus, in total, before the fraud was exposed, he sold 134,776 Company shares on inside information, for which he received nearly $23.6 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

25.     The Company's website states the following about Defendant Kennedy:[2]

Thomas A. Kennedy is the executive chairman of the Raytheon Technologies Board of Directors. He brings nearly 40 years of aerospace and defense and leadership experience, including expertise in strategic planning, operations, cybersecurity, engineering and technology, and international business.

Dr. Kennedy became executive chairman in 2020 upon the closing of the merger between Raytheon Company and United Technologies Corporation. Prior to the merger, he was chairman and chief executive officer of Raytheon Company. Throughout his career he held numerous executive and leadership positions at Raytheon, growing its international business and driving key technological innovations.

He is a member of the President's National Security Telecommunications Advisory Committee, the Rutgers School of Engineering Industry Advisory Board, the

---

[2]  https://www.rtx.com/Our-Company/corporate-governance/Thomas-A-Kennedy.  Last  visited November 24, 2020.

UCLA Engineering Dean's Executive Board and the Massachusetts Institute of Technology Presidential CEO Advisory Board.

Dr. Kennedy holds a Ph.D. in engineering from the University of California, Los Angeles, and bachelor's and master's degrees in electrical engineering from Rutgers University and the Air Force Institute of Technology, respectively.

**Defendant O'Brien**

26.     Defendant O'Brien has served as the Company's CFO since the Merger in April 2020. Prior to the Merger, he served as the Company's CFO since March 2015. Previously, Defendant O'Brien served in various finance positions since 1986 when he joined the Company, including as the Vice President and CFO of the Company's Integrated Defense Systems business unit from March 2008 until March 2015, and Vice President of Finance, and CFO for Raytheon Aircraft Company. According to the 2019 10-K/A, as of February 29, 2020, Defendant O'Brien beneficially owned 47,877 shares of the Company's common stock, which represented less than 1% of the Company's outstanding shares as of that date. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $82.18, Defendant O'Brien owned over $3.9 million worth of Raytheon stock.

27.     For the fiscal year ended December 31, 2019, Defendant O'Brien received $5,433,592 in compensation from the Company. This included $821,192 in salary, $1,342,400 results-based incentive compensation, $1,970,076 long-term performance plan compensation, and $1,299,924 in restricted stock awards. For the fiscal year ended December 31, 2018, Defendant O'Brien received $4,994,761 in compensation from the Company. This included $780,178 in salary, $1,114,700 results-based incentive compensation, $1,599,973 long-term performance plan compensation, and $1,499,910 in restricted stock awards. For the fiscal year ended December 31, 2017, Defendant O'Brien received $4,183,433 in compensation from the Company. This included $721,159 in salary, $912,400 results-based incentive compensation, $1,299,946 long-term

performance plan compensation, and $1,249,928 in restricted stock awards. For the fiscal year ended December 31, 2016, Defendant O'Brien received $3,642,856 in compensation from the Company. This included $608,510 in salary, $734,400 results-based incentive compensation, $1,199,945 long-term performance plan compensation, and $1,100,001 in restricted stock awards.

28.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant O'Brien made the following sales of Company stock:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| March 28, 2016 | 6,000 | $122.95 | $737,700.00 |
| June 6, 2016 | 1,238 | $133.35 | $165,087.30 |
| March 24, 2017 | 1,275 | $152.29 | $194,169.75 |
| March 1, 2018 | 10,503 | $214.18 | $2,249,532.54 |
| March 14, 2019 | 9,656 | $181.09 | $1,748,605.04 |
| March 4, 2020 | 9,539 | $197.89 | $1,887,672.71 |

Thus, in total, before the fraud was exposed, he sold 38,211 Company shares on inside information, for which he received nearly $7.0 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

29.     The Company's website states the following about Defendant O'Brien:[3]

Anthony F. "Toby" O'Brien is chief financial officer of Raytheon Technologies. His responsibilities include financial reporting and controls, planning and analysis, investor relations, tax and treasury.

O'Brien held numerous financial leadership positions at Raytheon Company prior to its merger with United Technologies Corporation in 2020. Most recently he served as the company's chief financial officer and vice president of finance.

---

[3] https://www.rtx.com/Our-Company/our-leadership/Anthony-OBrien. Last visited November 25, 2020.

Prior to that, he was vice president and chief financial officer of Raytheon's Integrated Defense Systems business. He held various other key finance positions within Raytheon Company, including vice president and chief financial officer of Raytheon Aircraft and vice president and chief financial officer of Raytheon Aircraft Integration.

O'Brien holds a bachelor's degree in finance from Boston College.

**Defendant Wood**

30.     Defendant Wood has served as the Company's Corporate Vice President and Controller since the Merger in April 2020. Prior to the Merger, he served as the Company's Vice President, Controller and Chief Accounting Officer from October 2006 until April 2020.

31.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Wood made the following sales of Company stock:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| June 6, 2016 | 2,582 | $133.35 | $344,309.70 |
| February 16, 2017 | 4,272 | $151.53 | $647,336.16 |
| March 29, 2017 | 518 | $151.73 | $78,596.14 |
| June 5, 2017 | 1,442 | $162.98 | $235,017.16 |
| January 26, 2018 | 1,974 | $206.90 | $408,420.60 |
| February 15, 2018 | 3,989 | $215.92 | $861,304.88 |
| March 23, 2018 | 543 | $214.35 | $116,392.05 |
| March 29, 2018 | 523 | $213.84 | $111,838.32 |
| June 4, 2018 | 621 | $212.21 | $131,782.41 |
| February 15, 2019 | 3,501 | $184.10 | $644,534.10 |
| March 22, 2019 | 543 | $180.81 | $98,179.83 |
| March 29, 2019 | 523 | $181.82 | $95,091.86 |
| April 4, 2019 | 427 | $177.58 | $75,826.66 |
| February 18, 2020 | 3,215 | $224.97 | $723,278.55 |
| March 26, 2020 | 1,254 | $152.48 | $191,209.92 |

Thus, in total, before the fraud was exposed, he sold 25,927 Company shares on inside information, for which he received nearly $4.8 million. His insider sales, made with knowledge of material non-

public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

32.     The 2019 10-K (defined below) stated the following about Defendant Wood:

**Michael J. Wood**
Mr. Wood has served as Vice President, Controller and Chief Accounting Officer since October 2006. Prior to joining Raytheon, Mr. Wood held positions of increasing responsibility over a 16-year career at KPMG LLP, an accounting firm, including as an Audit Partner serving various aerospace and defense clients. Age 51.

**<u>Defendant Atkinson</u>**

33.     Defendant Atkinson has served as a Company director since the Merger in April 2020. She also serves as the Chair of the Compensation Committee, as a member of the Audit Committee, and as a member of the Finance Committee. Prior to the Merger, she served as a Company director from 2014 until April 2020. She also served as the Chair of the Audit Committee. According to the 2019 10-K/A, as of February 29, 2020, Defendant Atkinson beneficially owned 5,234 shares of the Company's common stock, which represented less than 1% of the Company's outstanding shares as of that date. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $82.18, Defendant Atkinson owned over $430,130 worth of Raytheon stock.

34.     For the fiscal year ended December 31, 2019, Defendant Atkinson received $329,914 in compensation from the Company. This included $165,000 in fees earned or paid in cash, $154,914 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Atkinson received $307,946 in compensation from the Company. This included $158,000 in fees earned or paid in cash, $139,946 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Atkinson received $298,448 in compensation from the Company. This included $158,000 in fees earned or

paid in cash, $139,948 in stock awards, and $500 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Atkinson received $281,542 in compensation from the Company. This included $139,000 in fees earned or paid in cash, $140,042 in stock awards, and $2,500 in all other compensation.

35.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Atkinson made the following sale of Company stock:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| November 14, 2019 | 500 | $215.47 | $107,735.00 |

Her insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

36.     The Company's website states the following about Defendant Atkinson:[4]

Tracy A. Atkinson is a member of the Raytheon Technologies Board of Directors. She brings expertise in accounting, finance, risk management and regulatory matters.

Atkinson served as a member of the Raytheon Company board from 2014 until the closing of the merger between Raytheon Company and United Technologies Corporation, when she was appointed to the Raytheon Technologies board.

Prior to her retirement in March 2020, Atkinson served as an executive vice president of State Street Corporation with a number of senior finance and risk management roles including chief administration officer, chief compliance officer and treasurer. Prior to joining State Street Corporation, she held leadership positions at MFS Investment Management and was a partner at PricewaterhouseCoopers.

Atkinson serves on the Board of Directors of The Arc of Massachusetts, a nonprofit to improve the lives of people with intellectual and developmental disabilities.

---

[4]   https://www.rtx.com/Our-Company/corporate-governance/Tracy-A-Atkinson.   Last   visited November 25, 2020.

She holds a bachelor's degree in accounting from the University of Massachusetts and is a certified public accountant.

**Defendant Beauchamp**

37.     Defendant Beauchamp served as a Company director from 2015 until the Merger in April 2020. He also served as a member of the Audit Committee, as a member of the Management Development and Compensation Committee, and the Public Policy and Corporate Responsibility Committee. According to the 2019 10-K/A, as of February 29, 2020, Defendant Beauchamp beneficially owned 5,849 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $82.18, Defendant Beauchamp owned nearly $480,671 worth of Raytheon stock.

38.     For the fiscal year ended December 31, 2019, Defendant Beauchamp received $400,414 in compensation from the Company. This included $235,500 in fees earned or paid in cash, $154,914 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Beauchamp received $373,446 in compensation from the Company. This included $223,500 in fees earned or paid in cash, $139,946 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Beauchamp received $331,448 in compensation from the Company. This included $181,500 in fees earned or paid in cash, $139,948 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Beauchamp received $354,042 in compensation from the Company. This included $204,000 in fees earned or paid in cash, $140,042 in stock awards, and $10,000 in all other compensation.

39.     The Company's 2019 10-K/A stated the following about Defendant Beauchamp:

*Robert E. Beauchamp,* Chairman, BMC Software, Inc., age 60, has served as a Director since 2015. Mr. Beauchamp brings executive leadership experience and valuable commercial software, cybersecurity and information technology expertise to the Board, having served as the Chairman of BMC Software for over a decade

and as BMC's President and Chief Executive Officer for sixteen years. He also has significant experience in strategic planning, global operations and sales, finance, mergers and acquisitions, and risk management gained through various roles of increasing responsibility at BMC Software. Mr. Beauchamp is a member of the Audit, Management Development and Compensation, and Special Activities Committees.

- Positions at BMC Software, Inc. (provider of business service management software): Executive Chairman since October 2019; Interim President and Chief Executive Officer from April 2019 to October 2019; Chairman from 2016 to October 2018; Chairman, President and Chief Executive Officer from 2008 to 2016; President, Chief Executive Officer and member of the board of directors from 2001 to 2008; held a variety of other leadership roles of increasing responsibility from 1988 to 2001.

- Current Directorships: Anaplan, Inc. (business planning software company) since 2018 (currently serves as Lead Independent Director); Forcepoint, LLC (cybersecurity company owned by Raytheon) since 2016.

- *Past Directorships:* TransUnion (credit reporting and information processing and analysis company) from 2018 to April 2019; National Oilwell Varco, Inc. (provider of equipment and services for the oil and gas industry) from 2001 to 2015.

- *Key Skills and Experiences:* Cyber/Software; Commercial Business; Public Company CEO; Public Company Board Experience[.]

**Defendant Brown**

40.     Defendant Brown served as a Company director from March 13, 2018 until April 2020. She also served as a member of the Management Development and Compensation Committee and as a member of the Public Policy and Corporate Responsibility Committee. According to the 2019 10-K/A, as of February 29, 2020, Defendant Brown beneficially owned 1,658 shares of the Company's common stock, which represented less than 1% of the Company's outstanding shares as of that date. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $82.18, Defendant Brown owned over $136,254 worth of Raytheon stock.

41.    For the fiscal year ended December 31, 2019, Defendant Brown received $312,414 in compensation from the Company. This included $157,500 in fees earned or paid in cash and $154,914 in stock awards. For the fiscal year ended December 31, 2018, Defendant Brown received $294,446 in compensation from the Company. This included $154,500 in fees earned or paid in cash and $139,946 in stock awards. For the fiscal year ended December 31, 2017, Defendant Brown received $154,258 in compensation from the Company. This included $49,300 in fees earned or paid in cash and $104,958 in stock awards.

42.    The Company's 2019 10-K/A stated the following about Defendant Brown:

*Adriane M. Brown*, Retired President and Chief Operating Officer, Intellectual Ventures, LLC, age 61, has served as a Director since 2018. Ms. Brown brings to the Board extensive business leadership experience through her leadership positions at a number of global technology and commercial businesses. She also possesses significant experience relating to technology innovation and the protection and commercialization of intellectual property, as well as business development, strategic planning, international operations, risk management and finance. Ms. Brown is a member of the Management Development and Compensation, and Public Policy and Corporate Responsibility Committees.

- Positions with Intellectual Ventures, LLC (an invention capital company): Senior Advisor from 2017 to January 2019; President and Chief Operating Officer from 2010 to 2017.

- Positions with Honeywell International, Inc. (a defense, electronics and engineering company): Series of leadership positions beginning in 1999, including President and Chief Executive Officer, Transportation Systems.

- Positions with Corning, Inc. (a high technology materials provider): Variety of roles from 1980 to 1999, ultimately serving as Vice President and General Manager of the Environmental Products Division

- *Current Directorships:* eBay Inc. (provider of e-commerce marketplaces) since 2017; Allergan plc (a pharmaceuticals company) since 2017.

- *Past Directorship:* Harman International Industries, Inc. (designer of connected products and solutions for automakers, consumers and enterprises) from 2013 to 2017.

- *Affiliations:* Washington Research Foundation Board of Directors; Flying Fish Venture Partners; Pacific Science Center Board of Directors; Jobs for America's Graduates Board of Directors; University of Washington Innovation Roundtable; and Massachusetts Institute of Technology Civil & Environmental Engineering Visiting Committee.

- *Key Skills and Experiences*: Global Commercial Business Leadership; Cyber/Software; Operating Expertise[.]

**Defendant Clark**

43.     Defendant Clark served as a Company director from 2005 and as the Company's Lead Director from May 2013 until he resigned from his position with the Company effective May 30, 2019. He also served as the Chair of the Special Activities Committee.

44.     For the fiscal year ended December 31, 2019, Defendant Clark received $99,500 in compensation from the Company. This included $88,500 in fees earned or paid in cash and $10,000 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Clark received $373,564 in compensation from the Company. This included $172,500 in fees earned or paid in cash, $ 191,064 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Clark received $366,502 in compensation from the Company. This included $165,500 in fees earned or paid in cash, $191,002  in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Clark received $355,014 in compensation from the Company. This included $154,000 in fees earned or paid in cash, $191,014 in stock awards, and $10,000 in all other compensation.

45.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Clark made the following sales of Company stock:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| August 2, 2016 | 2,540 | $141.01 | $358,165.40 |

| August 14, 2017 | 829 | $180.19 | $149,377.51 |
| May 30, 2018 | 1,000 | $215.52 | $215,520.00 |

Thus, in total, before the fraud was exposed, he sold 4,369 Company shares on inside information, for which he received nearly $723,063. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Hadley**

46.     Defendant Hadley served as a Company director from 2009 until the Merger in April 2020. He also served as the Chair of the Governance and Nominating Committee, as a member of the Management Development and Compensation Committee, and as a member of the Special Activities Committee. According to the 2019 10-K/A, as of February 29, 2020, Defendant Hadley beneficially owned 6,850 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $82.18, Defendant Hadley owned $562,933 worth of Raytheon stock.

47.     For the fiscal year ended December 31, 2019, Defendant Hadley received $316,914 in compensation from the Company. This included $162,000 in fees earned or paid in cash and $154,914 in stock awards. For the fiscal year ended December 31, 2018, Defendant Hadley received $304,946 in compensation from the Company. This included $165,000 in fees earned or paid in cash and $139,946 in stock awards. For the fiscal year ended December 31, 2017, Defendant Hadley received $299,448 in compensation from the Company. This included $159,500 in fees earned or paid in cash and $139,948 in stock awards. For the fiscal year ended December 31, 2016, Defendant Hadley received $289,542 in compensation from the Company. This included $149,500 in fees earned or paid in cash and $140,042 in stock awards.

48.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hadley made the following sales of Company stock:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| November 30, 2017 | 800 | $190.16 | $152,128.00 |
| February 8, 2018 | 800 | $203.29 | $162,632.00 |
| May 15, 2018 | 1,000 | $209.23 | $209,230.00 |
| January 6, 2020 | 1,900 | $232.00 | $440,800.00 |
| February 3, 2020 | 1,900 | $220.62 | $419,178.00 |

Thus, in total, before the fraud was exposed, he sold 6,400 Company shares on inside information, for which he received nearly $1.4 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

49.     The Company's 2019 10-K/A stated the following about Defendant Hadley:

*Stephen J. Hadley*, Principal, Rice, Hadley, Gates & Manuel, LLC, age 73, has served as a Director since 2009. Mr. Hadley has substantial national security, international affairs, public policy and legal experience through his extensive career in government, consulting and private legal practice. He provides the Board with unique and diverse perspectives on the global security environment and international affairs, and valuable leadership and experience in the areas of strategic oversight, public policy and regulatory compliance. Mr. Hadley is a member of the Governance and Nominating, Management Development and Compensation, and Special Activities Committees.

- Principal in Rice, Hadley, Gates & Manuel, LLC (international strategic consulting firm) since 2009.

- Assistant to the President for National Security Affairs from 2005 to 2009.

- Assistant to the President and Deputy National Security Advisor from 2001 to 2005.

- Partner in the Washington, D.C. law firm of Shea & Gardner and a principal in The Scowcroft Group (international consulting firm) from 1993 to 2001.

- *Current Directorships:* The Bessemer Group, Incorporated (financial services holding company) (including service on its Audit Committee since 2013), Bessemer Securities Corporation (including service on its Audit Committee since 2011) and certain related entities (all privately-held financial services companies) since 2009.

- *Affiliations*: Director (and member of the Executive Committee) of the Atlantic Council of the United States since 2010, and Executive Vice Chair since 2015; Member of the Board of Managers of the Johns Hopkins University Applied Physics Laboratory since 2011; Member of Yale University's Kissinger Papers Advisory Board since 2011; Member, Board of Directors, U.S. Institute of Peace since 2013 and Chair since 2014; and Member of the Board of Directors of the Council on Foreign Relations since 2015.

- *Key Skills and Experiences*: Legal/Regulatory/Compliance; U.S. Department of Defense/Government; Aerospace/Defense Industry Expertise[.]

**Defendant Long**

50.     Defendant Long served as a Company director from 2015 until the Merger in April 2020. She also served as the Chair of the Public Policy and Corporate Responsibility Committee and as a member of the Audit Committee, as a member of the Governance and Nominating Committee, and as a member of the Special Activities Committee. According to the 2019 10-K/A, as of February 29, 2020, Defendant Long beneficially owned 3,519 shares of the Company's common stock, which represented less than 1% of the Company's outstanding shares as of that date. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $82.18, Defendant Long owned over $289,191 worth of Raytheon stock.

51.     For the fiscal year ended December 31, 2019, Defendant Long received $334,414 in compensation from the Company. This included $169,500 in fees earned or paid in cash, $154,914 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Long received $314,446 in compensation from the Company. This included $169,500 in fees earned or paid in cash, $139,946 in stock awards, and $5,000 in all other

compensation. For the fiscal year ended December 31, 2017, Defendant Long received $307,448 in compensation from the Company. This included $162,500 in fees earned or paid in cash, $139,948 in stock awards, and $5,000 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Long received $286,042 in compensation from the Company. This included $141,000 in fees earned or paid in cash, $140,042 in stock awards, and $5,000 in all other compensation.

52.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Long made the following sale of Company stock:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| January 2, 2018 | 650 | $186.32 | $121,108.00 |

Her insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

53.     The Company's 2019 10-K/A stated the following about Defendant Long:

*Letitia A. Long,* Retired Director, National Geospatial-Intelligence Agency, age 61, has served as a Director since 2015. Ms. Long brings to the Board substantial intelligence, national security and public policy experience developed through her numerous leadership positions in the U.S. government, which include service as the fifth Director of the National Geospatial-Intelligence Agency. Through this experience, combined with her roles on the boards of other companies and organizations, she provides critical insights on global intelligence and security matters and valuable leadership and experience in strategic planning and oversight, public policy, organizational management and technology. Ms. Long serves as the Chair of the Public Policy and Corporate Responsibility Committee and a member of the Governance and Nominating and Special Activities Committees.

- Director, National Geospatial-Intelligence Agency from 2010 to 2014.

- Deputy Director, Defense Intelligence Agency from 2006 to 2010.

- Deputy Under Secretary of Defense (Intelligence) for Policy, Requirements and Resources from 2003 to 2006.

- Deputy Director of Naval Intelligence from 2000 to 2003.

- 32-year career with the United States government holding a series of leadership roles of increasing responsibility

- *Current Directorships:* Octo Consulting Group (privately-held software development and IT modernization company) since February 2020; Quadrint, Inc. (privately-held provider of technical services) since September 2019; HyperSat LLC (privately-held provider of high-resolution hyperspectral satellite imagery and analysis) since 2018; and Noblis, Inc. (not-for-profit science, technology and strategy services provider) since 2015.

- *Past Directorship:* Urthecast Corporation (provider of video technology for Earth observation) from 2015 to June 2018; Sonatype, Inc. (privately-held software products company) from 2017 to 2019.

- *Affiliations*: Vice Rector, Virginia Polytechnic Institute and State University Board of Visitors; Member, United States Geospatial Intelligence Foundation Board of Directors; and Board Chair, Intelligence and National Security Alliance.

- *Key Skills and Experiences*: U.S. Department of Defense/Government; Aerospace/Defense Industry Expertise; Engineering/Science/Information Technology[.]

**Defendant Oliver**

54.     Defendant Oliver has served as a Company director since the Merger in April 2020. He also serves as a member of the Company's Governance and Public Policy Committee and as a member of the Compensation Committee. Prior to the Merger, he served as a Company director from 2013 until April 2020. He also served as the Chair of the Management Development and Compensation Committee and as a member of the Governance and Nominating Committee. According to the 2019 10-K/A, as of February 29, 2020, Defendant Oliver beneficially owned 6,967 shares of the Company's common stock. Given that the price per share of the Company's

common stock at the close of trading on February 28, 2020 was $82.18, Defendant Oliver owned over $572,548 worth of Raytheon stock.

55.     For the fiscal year ended December 31, 2019, Defendant Oliver received $312,914 in compensation from the Company. This included $148,000 in fees earned or paid in cash, $154,914 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Oliver received $292,446 in compensation from the Company. This included $142,500 in fees earned or paid in cash, $139,946 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Oliver received $295,448 in compensation from the Company. This included $145,500 in fees earned or paid in cash, $139,948 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Oliver received $288,042 in compensation from the Company. This included $138,000 in fees earned or paid in cash, $140,042 in stock awards, and $10,000 in all other compensation.

56.     The Company's website states the following about Defendant Oliver:[5]

George R. Oliver is a member of the Raytheon Technologies Board of Directors. He brings expertise in public company executive leadership, global commercial operations, technology and strategy development.

Oliver served as a member of the Raytheon Company board from 2013 until the closing of the merger between Raytheon Company and United Technologies Corporation, when he was appointed to the Raytheon Technologies board.

He is chairman and chief executive officer of Johnson Controls International plc. He was the chief executive officer and a director of Tyco International Ltd. prior to its merger with Johnson Controls, and before that he was president of Tyco Fire Protection, Tyco Electrical & Metal Products and Tyco Safety Products.

Before joining Tyco, he served in operational leadership roles of increasing responsibility at several General Electric divisions.

---

[5]   https://www.rtx.com/Our-Company/corporate-governance/George-R-Oliver.   Last   visited November 25, 2020.

Oliver serves on the Worcester Polytechnic Institute Board of Trustees, the Pro Football Hall of Fame Board of Trustees and the United Way of Greater Milwaukee Board of Directors.

He holds a bachelor's degree in mechanical engineering from Worcester Polytechnic Institute.

**Defendant Paliwal**

57.     Defendant Paliwal has served as the Company's Lead Director since the Merger in April 2020. He also serves as a member of the Governance and Public Policy Committee and as a member of the Compensation Committee. Prior to the Merger, Defendant Paliwal served as a Company director from 2016 until April 2020. He also served as the Chair of the Governance and Nominating Committee and as a member of the Public Policy and Corporate Responsibility Committee. According to the 2019 10-K/A, as of February 29, 2020, Defendant Paliwal beneficially owned 3,662 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $82.18, Defendant Paliwal owned over $300,943 worth of Raytheon stock.

58.     For the fiscal year ended December 31, 2019, Defendant Paliwal received $294,414 in compensation from the Company. This included $139,500 in fees earned or paid in cash and $154,914 in stock awards. For the fiscal year ended December 31, 2018, Defendant Paliwal received $273,446 in compensation from the Company. This included $133,500 in fees earned or paid in cash and $139,946 in stock awards. For the fiscal year ended December 31, 2017, Defendant Paliwal received $274,948 in compensation from the Company. This included $135,000 in fees earned or paid in cash and $139,948 in stock awards. For the fiscal year ended December 31, 2016, Defendant Paliwal received $113,145 in compensation from the Company. This included $19,700 in fees earned or paid in cash and $93,445 in stock awards.

59.     The Company's website states the following about Defendant Paliwal:[6]

Dinesh C. Paliwal is a member of the Raytheon Technologies Board of Directors. He brings expertise in public company executive leadership, global operations and sales, and technology and innovation.

Paliwal served as a member of the Raytheon Company board from 2016 until the closing of the merger between Raytheon Company and United Technologies Corporation, when he was appointed to the Raytheon Technologies board.

Until April 2020, Paliwal was the president, chief executive officer and a director of Harman International, a company that designs and engineers connected products for automakers, consumers and commercial companies. He now serves as Senior Advisor to its Board and CEO.

Prior to joining Harman, Paliwal served as president of ABB Group and chairman and chief executive officer of ABB North America. He serves on the boards of directors of Bristol-Myers Squibb and Nestle, and is also a member of the Business Roundtable and the U.S.- India Business Council. He also serves on the advisory boards of the John F. Kennedy Center for the Performing Arts and The Wilson Center, and the Board of Visitors of the Farmer School of Business at Miami University.

He holds an MBA in finance and marketing and a master's degree in applied science and engineering, both from Miami University of Ohio, and a master's degree in engineering from the Indian Institute of Technology.

**Defendant Pawlikowski**

60.     Defendant Pawlikowski has served as a Company director since the Merger in April 2020. She also serves as a member of the Audit Committee and as a member of the Special Activities Committee. Prior to the Merger, Defendant Pawlikowski served as a Company director from March 13, 2018 until April 2020. She also served as a member of the Audit Committee and as a member of the Special Activities Committee. According to the 2019 10-K/A, as of February 29, 2020, Defendant Pawlikowski beneficially owned 492 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on

---

[6]   https://www.rtx.com/Our-Company/corporate-governance/Dinesh-C-Paliwal.   Last   visited November 25, 2020.

February 28, 2020 was $82.18, Defendant Pawlikowski owned nearly $40,433 worth of Raytheon stock.

61.     For the fiscal year ended December 31, 2019, Defendant Pawlikowski received $313,914 in compensation from the Company. This included $150,000 in fees earned or paid in cash, $154,914 in stock awards, and $9,000 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Pawlikowski received $138,717 in compensation from the Company. This included $39,230 in fees earned or paid in cash and $99,487 in stock awards.

62.     The Company's website states the following about Defendant Pawlikowski:[7]

Ellen M. Pawlikowski is a member of the Raytheon Technologies Board of Directors. She brings expertise in senior leadership, engineering, the defense industry and technology.

Gen. Pawlikowski served as a member of the Raytheon Company board from 2018 until the closing of the merger between Raytheon Company and United Technologies Corporation, when she was appointed to the Raytheon Technologies board.

She is a retired four-star general and former commander of the U.S. Air Force Materiel Command. In her 40-year Air Force career she held numerous technical management, leadership and staff positions, including with the Space and Missile Systems Center and the Air Force Research Laboratory.

She serves on the board of directors of Intelsat SA and is a member of the United States National Academy of Engineers and an honorary fellow of the American Institute of Aeronautics and Astronautics.

She holds a doctorate in chemical engineering from the University of California, Berkeley, and a bachelor's degree in chemical engineering from the New Jersey Institute of Technology.

**Defendant Spivey**

63.     Defendant Spivey served as a Company director from 1999 until the Merger in April 2020. He also served as the Company's Lead Director, the Chair of the Management

---

[7] https://www.rtx.com/Our-Company/corporate-governance/Ellen-M-Pawlikowski. Last visited November 25, 2020.

Development Compensation Committee, as a member of the Governance and Nominating Committee, and as a member of the Special Activities Committee. According to the 2019 10-K/A, as of February 29, 2020, Defendant Spivey beneficially owned 23,786 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $82.18, Defendant Spivey owned nearly $2.0 million worth of Raytheon stock.

64.     For the fiscal year ended December 31, 2019, Defendant Spivey received $358,582 in compensation from the Company. This included $152,500 in fees earned or paid in cash and $206,082 in stock awards. For the fiscal year ended December 31, 2018, Defendant Spivey received $294,946 in compensation from the Company. This included $155,000 in fees earned or paid in cash and $139,946 in stock awards. For the fiscal year ended December 31, 2017, Defendant Spivey received $291,448 in compensation from the Company. This included $151,500 in fees earned or paid in cash and $139,948 in stock awards. For the fiscal year ended December 31, 2016, Defendant Spivey received $280,542 in compensation from the Company. This included $140,500 in fees earned or paid in cash and $140,042 in stock awards.

65.     The Company's 2019 10-K/A stated the following about Defendant Spivey:

*William R. Spivey*, Retired President and Chief Executive Officer, Luminent, Inc., age 73, has served as a Director since 1999. Mr. Spivey has extensive business leadership experience through his roles as both a CEO and business unit leader at a number of public technology companies and a director of numerous U.S. and global technology and industrial companies. He also has significant experience in strategic oversight, global operations and sales, finance, risk management, and technology. Mr. Spivey serves as the Lead Director.

- President and Chief Executive Officer of Luminent, Inc. (fiber-optic transmission products provider) from 2000 to 2001.

- Group President, Network Products Group, Lucent Technologies Inc. from 1997 to 2000.

- Vice President, Systems & Components Group, AT&T Corporation from 1994 to 1997.

- Group Vice President and President, Tektronix Development Company, Tektronix, Inc. from 1991 to 1994.

- 32-year career with the United States government holding a series of leadership roles of increasing responsibility

- *Past Directorship:* Cascade Microtech, Inc. (advanced wafer probing solutions provider) from 1998 to 2016; Lam Research Corporation (advanced process equipment provider) from 2012 to 2015; Laird PLC (electronics components and systems provider) from 2002 to 2012; Novellus Systems, Inc. (advanced process equipment provider) from 1998 to 2012; ADC Telecommunications, Inc. (supplier of network infrastructure products and services) from 2004 to 2010; Lyondell Chemical Company (manufacturer of basic chemicals and derivatives) from 2000 to 2007; Luminent, Inc. (fiber-optic transmission products provider) from 2000 to 2001.

- *Key Skills and Experiences*: Corporate Governance/Public Company Board or Committee Leadership; Commercial Business; Operating Expertise[.]

### **Defendant Stewart**

66.     Defendant Stewart served as a Company director from June 27, 2018 until April 2020. She also served as a member of the Audit Committee and as a member of the Public Policy and Corporate Responsibility Committee. According to the 2019 10-K/A, as of February 29, 2020, Defendant Stewart beneficially owned 667 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $82.18, Defendant Stewart owned over $54,814 worth of Raytheon stock.

67.     For the fiscal year ended December 31, 2019, Defendant Stewart received $295,914 in compensation from the Company. This included $141,000 in fees earned or paid in cash and $154,914 in stock awards. For the fiscal year ended December 31, 2018, Defendant Stewart received $189,347 in compensation from the Company. This included $60,923 in fees earned or paid in cash and $128,424 in stock awards.

68. The Company's 2019 10-K/A stated the following about Defendant Stewart:

*Marta R. Stewart*, Retired Executive Vice President and Chief Financial Officer, Norfolk Southern Corporation, age 62, has served as a Director since 2018. Ms. Stewart provides deep financial and accounting knowledge and expertise in a public company context acquired during her long career at Norfolk Southern Corporation, preceded by her time as a Certified Public Accountant at Peat Marwick (a predecessor to KPMG). She also has extensive experience with risk management, commercial markets and customers, and mergers and acquisitions. Ms. Stewart is a member of the Audit and Public Policy and Corporate Responsibility Committees.

- Positions at Norfolk Southern Corporation (a rail transportation company): Executive Vice President and Chief Financial Officer from 2013 to 2017; Vice President of Finance and Treasurer from 2009 to 2013; Vice President of Accounting and Controller from 2003 to 2009; Assistant Vice President of Corporate Accounting from 1998 to 2003; held a variety of positions of increasing responsibility from 1983 to 1998.

- Various audit roles culminating in Supervising Senior Accountant at Peat Marwick (an accounting and auditing firm that later became part of KPMG) from 1979 to 1983.

- *Current Directorships:* Simon Property Group Inc. (commercial owner, developer and manager of commercial real estate) since 2018.

- *Key Skills and Experiences*: Financial/Accounting Expertise; M&A/Strategy/Development; Risk Management[.]

**Defendant Winnefeld**

69. Defendant Winnefeld has served as a Company director since the Merger in April 2020. He also serves as the Chair of the Special Activities Committee, as a member of the Compensation Committee and as a member of the Finance Committee. Prior to the Merger, Defendant Winnefeld served as a Company director from 2017 until April 2020. He also served as the Chair of the Special Activities Committee, as a member of the Audit Committee, and as a member of the Management Development and Compensation Committee. According to the 2019 10-K/A, as of February 29, 2020, Defendant Winnefeld beneficially owned 2,824 shares of the Company's common stock. Given that the price per share of the Company's common stock at the

close of trading on February 28, 2020 was $82.18, Defendant Winnefeld owned over $232,076 worth of Raytheon stock.

70.     For the fiscal year ended December 31, 2019, Defendant Winnefeld received $321,914 in compensation from the Company. This included $162,000 in fees earned or paid in cash, $154,914 in stock awards, and $5,000 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Winnefeld received $292,446 in compensation from the Company. This included $150,000 in fees earned or paid in cash, $139,946 in stock awards, and $2,500 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Winnefeld received $323,860 in compensation from the Company. This included $126,865 in fees earned or paid in cash, $186,995 in stock awards, and $10,000 in all other compensation.

71.     The Company's website states the following about Defendant Winnefeld:[8]

James A. Winnefeld, Jr., is a member of the Raytheon Technologies Board of Directors. He brings expertise in government, the defense industry, risk management and senior leadership.

Adm. Winnefeld served as a member of the Raytheon Company board from 2017 until the closing of the merger between Raytheon Company and United Technologies Corporation, when he became a member of the Raytheon Technologies board.

He is a retired four-star admiral and was the ninth vice chairman of the Joint Chiefs of Staff. His 37-year U.S. Navy career includes having served as commander of U.S. Northern Command and of NORAD, the North American Aerospace Defense Command. His operational commands include having served as commander of the U.S. Sixth Fleet, and of Allied Joint Command Lisbon.

Adm. Winnefeld serves on the boards of directors of Alliance Laundry Systems LLC, Cytec Defense Materials and Enterprise Holdings, Inc.

He holds a bachelor's degree in aerospace engineering from the Georgia Institute of Technology.

---

[8] https://www.rtx.com/Our-Company/corporate-governance/James-A-Winnefeld-Jr. Last visited November 25, 2020.

**Defendant Work**

72.     Defendant Work has served as a Company director since the Merger in April 2020. He also serves as the Chair of the Governance and Public Policy Committee, as a member of the Audit Committee, and as a member of the Special Activities Committee. Prior to the Merger, Defendant Work served as a Company director from 2017 until April 2020. He also served as a member of the Audit Committee, Public Policy and Corporate Responsibility Committee, and as a member of the Special Activities Committee. According to the 2019 10-K/A, as of February 29, 2020, Defendant Work beneficially owned 1,250 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $82.18, Defendant Work owned over $102,725 worth of Raytheon stock.

73.     For the fiscal year ended December 31, 2019, Defendant Work received $312,414 in compensation from the Company. This included $157,500 in fees earned or paid in cash and $154,914 in stock awards. For the fiscal year ended December 31, 2018, Defendant Work received $294,446 in compensation from the Company. This included $154,500 in fees earned or paid in cash and $139,946 in stock awards. For the fiscal year ended December 31, 2017, Defendant Work received $154,258 in compensation from the Company. This included $49,300 in fees earned or paid in cash and $104,958 in stock awards.

74.     The Company's website states the following about Defendant Work:[9]

Robert O. Work is a member of the Raytheon Technologies Board of Directors. He brings expertise in global security, defense technology, government and risk management.

Work served as a member of the Raytheon Company board from 2017 until the closing of the merger between Raytheon Company and United Technologies Corporation, when he became a member of the Raytheon Technologies board.

---

[9]   https://www.rtx.com/Our-Company/corporate-governance/Robert-O-Work.    Last    visited November 25, 2020.

He was a U.S. deputy secretary of Defense and the chief executive officer of the Center for a New American Security. He also served as undersecretary of the U.S. Navy and vice president for strategic studies at the Center for Strategic and Budgetary Assessments. He served 27 years in the U.S. Marine Corps, with various positions of responsibility, including artillery battery commander, battalion commander, base commander and senior aide to the Secretary of the Navy.

Work serves on the boards of directors of BlackLynx, Hensoldt Inc. and System High Corporation.

He holds three master's degrees: one in systems management from the University of Southern California, one in space system operations from the Naval Postgraduate School and one in international policy from Johns Hopkins University. He also holds a bachelor's degree in biology from the University of Illinois at Urbana-Champaign.

### Non-Party Gregory J. Hayes

75.     Non-Party Gregory J. Hayes ("Hayes") has served as the Company's President and CEO and as a Company director since the Merger in April 2020. He also serves as a member of the Finance Committee and as a member of the Special Activities Committee. Prior to the Merger, he had served as UTC's CEO since 2014 and Chairman since 2016. Previously, Hayes, served in various leadership roles with UTC since 1999 including having served as UTC's CFO from 2008 until 2014.

76.     For the fiscal year ended December 31, 2019, Hayes received $21,538,847 in compensation from UTC. This included $1,600,000 in salary, $4,200,000 in bonus, $6,816,740 in stock awards, and $6,535,560 in option awards, $2,071,748 in chain in pension value and nonqualified deferred compensation earnings, and $314,799 in all other compensation.

77.     The Company's website states the following about Hayes:[10]

Gregory J. Hayes is the chief executive officer of Raytheon Technologies Corporation, responsible for leading an aerospace and defense company of 195,000 employees and $74 billion in annual sales.

---

[10]   https://www.rtx.com/Our-Company/corporate-governance/Gregory-J-Hayes.   Last   visited November 8, 2020.

Also serving as a member of the company's Board of Directors, Hayes has a nearly 21-year career at United Technologies Corporation, holding several senior leadership roles across finance, corporate strategy and business development, culminating with his appointment to chief executive officer in 2014 and chairman in 2016. As CEO, Hayes led the reshaping of UTC from industrial conglomerate to focused aerospace company. Beginning with the divestiture of Sikorsky Aircraft in 2015 and the acquisition of Rockwell Collins in 2018, Hayes continued to focus the business with the spinoffs of Otis Elevator Company and Carrier Corporation in 2020. Hayes then led the merger of UTC's remaining aerospace businesses, Pratt & Whitney and Collins Aerospace Systems, with the Raytheon Company, to form the new Raytheon Technologies in April 2020.

Hayes, who joined UTC in 1999 through its merger with the Sundstrand Corporation, also served as UTC's chief financial officer from 2008-2014.

Hayes holds a bachelor's degree in economics from Purdue University and is a Certified Public Accountant.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

78.    By reason of their positions as officers, directors, and/or fiduciaries of Raytheon and because of their ability to control the business and corporate affairs of Raytheon, the Individual Defendants owed Raytheon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Raytheon in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Raytheon and its shareholders so as to benefit all shareholders equally.

79.    Each director and officer of the Company owes to Raytheon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

80.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Raytheon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

81.   To discharge their duties, the officers and directors of Raytheon were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

82.   Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Raytheon, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Raytheon's Board at all relevant times.

83.   As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this

complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

84.     To discharge their duties, the officers and directors of Raytheon were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Raytheon were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Raytheon's own Code of Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Raytheon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Raytheon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Raytheon's operations would comply with all

applicable laws and Raytheon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

85.     Each of the Individual Defendants further owed to Raytheon and the shareholders the duty of loyalty requiring that each favor Raytheon's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

86.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Raytheon and were at all times acting within the course and scope of such agency.

87.     Because of their advisory, executive, managerial, and directorial positions with Raytheon, each of the Individual Defendants had access to adverse, non-public information about the Company.

88.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Raytheon.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

89.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

90.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

91.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Raytheon was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

92.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with

actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

93.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Raytheon, and was at all times acting within the course and scope of such agency.

## RAYTHEON'S CODE OF CONDUCT

94.    Raytheon's Code of Conduct provides that "[t]he Code applies to all employees, officers, and directors" and explains that it is "intended to inspire, guide, and enable our best performance" and that it "promotes ethical decision-making and conduct."

95.    In a section titled, "Dealing Honestly and Fairly," the Code of Conduct states the following, in relevant part:

> Truthful and accurate communication of information about our products and services is essential to meeting our commitments to our customers; they deserve candid assessments of our products' capabilities and limitations. Being fair and truthful with our business partners promotes dependable relationships that help us serve our customers and deliver safe, reliable products and services. Our competitors respect us for our commitment to competing fairly, honestly, and on the merits of our products, services, and people.
>
> * * *
>
> Dealing honestly and fairly in the marketplace means that we:
> • Market and sell our products truthfully, based on their merits;
> • Prepare bid proposals based on properly estimated cost and pricing data;
> • Always maintain the integrity of the bidding process and negotiate contracts in good faith;
>
> * * *
>
> • Comply with the letter and spirit of all applicable laws and regulations; and
> • Require all our representatives, consultants, and business partners to comply with these requirements

96.     In a section titled, "Serving Government Customers," the Code of Conduct states

the following, in relevant part:

> We work closely with many government entities worldwide. Each has specific rules
> and regulations we must understand and follow in serving them. Those spell out
> how we compete for and obtain contracts; which costs can be included in our prices;
> and what we deliver—including product testing, inspection, services, and reports.
> By competing fairly for contracts on the merits of our products and offerings, and
> by complying with applicable laws, regulations, and contract requirements, we
> serve our government customers well; and we give them confidence that they have
> chosen the right supplier.
>
> * * *
>
> Serving government customers means that we:
> • Recognize that government contracts often have very different requirements from
> commercial contracts (with severe penalties for non-compliance);
> • Adhere to all contract terms and the required bidding, pricing, and quality
> standards;
> • Charge time, travel, material, and other expenses accurately, claim only allowable
> costs, and follow appropriate accounting practices;
> • Comply with all company processes and procedures to ensure appropriate
> accounting practices;
> • Ensure all proposals, quotes, invoices, tests, certifications, communications, and
> any other government-required documentation are current, accurate, and complete;
> • Don't seek or use unauthorized information about competitors or competing bids;
> • Follow applicable laws, regulations, and rules, including: – U.S. Procurement
> Integrity Act – Federal Acquisition Regulation (FAR) and applicable FAR
> supplements, such as the Defense Federal Acquisition Regulation Supplement
> (DFARS) – International Traffic in Arms Regulations (ITAR) – Those that apply
> from countries other than the United States
> • Comply with restrictions on gifts, gratuities, job offers, etc., to government
> officials and their relatives;

97.     In a section titled, "Competing Fairly and Legally," the Code of Conduct states the

following:

> Competition makes us better. Free markets drive us to be more efficient and
> innovative and to deliver better products and services. This is good for us, and for
> our customers, who receive better value. Anti-competitive practices, on the other
> hand, distort the marketplace. Collusion between competitors—to fix prices, carve
> up markets, or rig bids, for instance—leads to excessive prices and substandard
> products and services. When these practices involve government contracts, they
> also cheat taxpayers; and they harm government customers if they result in the

40

purchase of substandard or unsafe products used for national defense. Well over 100 countries now have laws that make anti-competitive conduct illegal. No matter where we do business, anti-competitive activities are always a violation of our values. They can also result in severe civil or criminal penalties for companies and individuals. We compete fairly and legally, not only because it is good for our business and reputation but because it is the right thing to do.

\* \* \*

Competing fairly and legally means that we:
• Act independently and not in coordination with competitors, unless there is a legitimate business arrangement, such as a joint venture or teaming relationship;
• Never share details of bids or quotes with anyone other than the customer, unless it is lawful and there is a specific business need to know (e.g., due to teaming or subcontractor arrangements where non-disclosure agreements are in place);
• Avoid even the appearance of improper agreements with competitors;
• Consult with the Office of General Counsel before engaging in commercial practices that could have the effect of harming competition, such as (but not limited to): – Exchanging information with competitors – Bundling or tying arrangements – Price discrimination – Predatory pricing – Exclusive dealing contracts – Refusing to supply our competitors – Non-compete clauses
• Seek approval before participating in trade associations and other groups that require frequent contacts with competitors; and
• Immediately report competition concerns to Global Ethics & Compliance or the Office of General Counsel.

98.     In a section titled, "Gathering Competitive Intelligence," the Code of Conduct

states the following, in relevant part:

In a challenging and dynamic global marketplace, it is important for us to learn all we can about our competition through appropriate means. This helps us hone and differentiate our products; it allows us to recognize industry trends and to anticipate changing customer needs. As important as this information is, we would never violate the law or compromise our integrity to seek or obtain competitively sensitive or other nonpublic proprietary information. Instead, we treat our customers and competitors the way we want them to treat us: fairly and honestly.

99.     In a section titled, "Doing Business Globally," the Code of Conduct states the

following, in relevant part:

Raytheon Technologies is proud to have customers and operations in dozens of countries and to do business with customers, suppliers, and partners in many more jurisdictions around the world. Our business is highly regulated, and this means we must follow a complex array of laws and regulations governing international trade

in the countries where we operate. National governments and intergovernmental organizations use export and import trade laws to control the movement or release of goods, services, and technologies. This helps to: safeguard national security; prevent proliferation of weapons of mass destruction; support foreign policy objectives; combat unfair trade practices; and protect health, safety, and scarce resources. As a manufacturer and supplier of cutting-edge military, dual-use, and commercial systems, we cannot allow our products and technologies to get into the wrong hands. Failure to meet our trade compliance obligations could have severe consequences: damage to national security; harm to warfighters; an inability to continue to serve customers; loss of trust from our customers, regulators, and suppliers; significant reputational damage to the company; and very large fines.

* * *

Meeting our trade compliance obligations means that we:
• Identify and classify our products, technologies, services, and any other item we may export or import to determine how they are controlled;
• Appropriately mark products, documents, software, and other controlled items to ensure recipients are made aware of their obligations to protect these materials;
• Safeguard controlled commodities and technology, both physical and intangible, against unauthorized export, import, transfer, or release;
• Ensure appropriate government authorizations exist to allow the transfer of all items provided to customers, suppliers, business partners, and other third parties as well as among our own operations, including:

– Complying with the terms and conditions of all government-approved export and import authorizations;
– Screening all transactions against relevant sanctions and restricted party lists and ensuring that we comply with all applicable laws and regulations prohibiting doing business with sanctioned or restricted countries, regions, entities, and individuals;
– Confirming that the ultimate end-use, end-user, and destination are permitted;
– Overseeing any authorization for the life cycle of the transaction;
– Identifying any appropriately reported "red flags."

• Maintain accurate records and effective transfer, tracking, and reporting mechanisms;
• Correctly value imported goods so that we make accurate and timely entries, pay the right import duties, and ensure proper country-of-origin declarations;
• Do not agree to or engage in any boycott-related activities that are inconsistent with U.S. anti-boycott laws and report, as required, any request to refuse to deal with potential or actual customers, suppliers, or countries, or to otherwise participate in activities related to an unsanctioned boycott; and
• Promptly raise any international trade compliance concerns to Global Trade or the Office of General Counsel.

100.     In a section titled, "Preventing Bribery and Corruption," the Code of Conduct states

the following:

> We win business and select business partners honestly and fairly. This builds trust and tells the world we will only do business the right way. Corruption is not a victimless crime. Apart from breaking the law, those who pay or receive bribes are feeding a problem that hurts millions around the world. Corruption prolongs poverty and hinders access to basic services; it destabilizes markets and entire economies; and in the worst cases, it undermines the rule of law. We do not tolerate corruption and try to use our influence as a global company to help stamp it out.
>
> * * *
>
> Preventing bribery and corruption means that we:
> • Win on the merits of our products, services, and business terms;
> • Never offer or accept bribes, kickbacks, or anything of value that could improperly influence—or appear to influence—a business decision;
> • Take special care not to promise or provide anything of value to public officials or anyone else to gain a business advantage (See the section on Gifts & Entertainment);
> • Apply company policies and our values when it comes to giving and receiving business gifts and entertainment and seek guidance from Global Ethics & Compliance or the Office of General Counsel if unsure about the correct course of action;
> • Record all transactions completely, accurately, and truthfully;
> • Follow the letter and spirit of anti-corruption laws everywhere we do business;
> • Choose business partners carefully and hold them to our high ethical standards;
> • Never use a third party to do anything improper on our behalf, including making improper payments, because we cannot do it ourselves; and
> • Immediately report any corruption or bribery concerns to Global Ethics & Compliance or the Office of General Counsel.

101.     The "Preventing Bribery and Corruption," section of the Code of Conduct

continues by stating:

> Raytheon Technologies believes in competing fairly. We do this on the strength of our products and services, not with gifts, hospitality, or sponsorships. This is a key part of our approach to ethical conduct. Always remember that:
>
> ! Various countries have laws that prohibit certain business-related gifts and hospitality;
>
> ! Perceptions are powerful:
>    • What one person might see as modest may strike someone else as excessive;

43

• Our receiving gifts or hospitality could lead others to think we are acting improperly.

! The risk of a poor perception increases if there is a pattern of frequent giving;

! It is never acceptable to link a gift, hospitality, or sponsorship to:
   • Seeking business
   • Retaining business
   • Obtaining an improper business advantage

! Improper giving can lead to disciplinary action and expose you and the company to criminal prosecution.

We may offer and accept gifts, hospitality, and sponsorship only if they:
• Are appropriate according to the above standards and local culture;
• Serve a legitimate business purpose;
• Do not compromise our judgment;
• Are accurately recorded in our books and records; and
• Are consistent with applicable Raytheon Technologies policies and procedures and all necessary approvals are obtained.

102.   In a section titled, "Protecting Our Reputation and Other Assets," the Code of

Conduct states the following:

Our focus on integrity and trust demand that we never allow personal interests and relationships to interfere with making the best decisions for Raytheon Technologies. Using good judgment to do what is right for our business helps us maintain excellence; it also enables us to collaborate and innovate without distraction. Even the appearance of a conflict of interest can be a problem because it could lead others to think we are not acting properly. Conflicts of interest can be avoided or addressed if promptly disclosed and properly managed.

* * *

Avoiding conflicts of interest means that we:
• Proactively identify situations that could put the company's interests and our own into possible conflict;
• Disclose actual or potential conflicts consistent with company policy and applicable laws and regulations;
• Remove ourselves from the decision-making process when a conflict may exist;
• Don't allow the desire to help friends and family to influence our decisions at work;
• Are not influenced by the prospect of financial gain for ourselves or our family members;
• Win business and build relationships based on trust and mutual value—never through inappropriate gifts or hospitality;

• Show loyalty to Raytheon Technologies by not keeping for ourselves opportunities gained through the use of company position or resources; and
• Give our best effort at work every day, not allowing outside jobs or other activities to hinder our contributions to our business. All actual and potential conflicts must be disclosed for review. If you have a conflict of interest concern, seek guidance from your local Human Resources representative or Ethics & Compliance Officer.

Conflicts may arise when we have business, financial, or close personal relationships with our current, former, or potential:
• Competitors
• Customers
• Employees
• Suppliers
• Regulators Here are some examples of situations in which a conflict of interest might arise and must be disclosed:
• Former employment with the U.S. government;
• Former employment with a competitor, supplier, or customer;
• A second job (dual employment);
• Direct or indirect supervision of a family member, close friend, intimate partner, etc., at Raytheon Technologies or a supplier, or vendor;
• Having a financial interest in a private business that competes with or derives income from Raytheon Technologies;
• Serving on a non-Raytheon Technologies governing or advisory board; and
• Personal development of inventions, innovation, software, or intellectual property

103.    In a section titled, "Creating, Maintaining, and Disclosing Accurate Books and Records," the Code of Conduct states the following:

We keep accurate books and records, which helps us to operate effectively and provide timely and truthful information to those who rely on it.

* * *

Whether preparing the company's annual report or completing a timesheet, we are playing a role in upholding the company's commitment to accurate record keeping and financial integrity. We are all accountable for ensuring that our records—in whatever form—are complete, accurate, and up to date. This allows us to make sound business decisions based on the right information. Even more importantly, it protects our reputation for integrity—customers, shareholders, financial analysts, regulators, and others count on us to be truthful. Misstating financial results or incorrectly describing transactions may be forms of fraud and can lead to serious civil and criminal penalties.

* * *

45

Creating, maintaining, and disclosing accurate books and records means that we:
• Record all assets, liabilities, revenues, expenses, and business transactions completely, accurately, in the proper period, and in a timely manner;
• Prepare books and records to conform to generally accepted accounting principles, our policies, and our internal controls system;
• Never set up secret or unrecorded cash funds or other assets or liabilities;
• Use appropriate and accurate wording when creating records;
• Correct any errors promptly, notifying those affected;
• Do not conceal or destroy documents or records that are subject to investigation or may be needed in legal proceedings;
• Comply with Legal Hold notices;
• Maintain and eliminate company records in compliance with our records retention and management policies;
• Accurately record any gifts or hospitality given or received, and any sponsorships, consistent with company policies; and • Speak up when we have questions or concerns about accurate financial reporting, accounting, or financial integrity

104.    In a section titled, "Safeguarding Company Assets," the Code of Conduct states the

following:

We protect Raytheon Technologies' reputation and other assets because they are the launchpad for our future success.

* * *

The reputation of our businesses, assets, and products has been developed over many decades of innovation—and by doing things the right way. Our journey into the future requires that we maintain these habits and take care of what we'll need along the way. We all have a responsibility to be good stewards of the company's assets—physical, financial, and intangible. When we protect them from damage, loss, waste, and misuse, we serve our customers and shareholders well; we also secure the foundation for our future growth.

* * *

Safeguarding company assets means that we:
• Use company assets with care and only for business purposes;
• Prevent loss, waste, destruction, theft, and abuse of company resources;
• Limit personal use of company communications equipment and systems and never access inappropriate or restricted content;
• Report circumstances where we suspect company assets are at risk and cooperate with all audits and investigations;
• Ensure that business transactions are authorized by management and subjected to internal review and approval processes;

46

• Design and follow internal controls that help ensure accurate financial reporting and full compliance with laws and regulations;
• Prevent financial assets from being used for money laundering or terrorist financing by remaining alert to warning signs and following international regulations; and
• Follow internal controls and procedure for international travel with company laptops and other electronic assets.

105.    In a section titled, "Preventing Insider Trading," the Code of Conduct states the following:

We never use or share inside information about Raytheon Technologies or another company for the purpose of trading securities.

Through our work, we may have access to information about Raytheon Technologies or other companies that could be potentially useful to investors. Honoring our value of trust means showing that we can always be relied on to protect information entrusted to us. "Inside information" (sometimes called material, nonpublic information) consists of details that an investor would consider important in making an investment decision. Using this information for our own benefit or sharing it for the benefit of others is called insider trading. It is illegal because it provides an unfair advantage and distorts financial markets. The insider trading laws in the U.S. and other countries are enforced aggressively, which can mean heavy fines and imprisonment for those convicted.

Preventing insider trading means that we:
• Never use inside information to trade shares in Raytheon Technologies or any other publicly traded company—unless and until such information has been made public;
• Do not share inside information with anyone outside the company, including family members, relatives, or friends;
• Share inside information with colleagues only on a need-to-know basis;
• Take care to protect inside information from accidental disclosure (e.g., by securing confidential documents and by not discussing sensitive company information in public places); and
• Avoid "tipping"—passing along material, non-public information about any company to anyone who may be tempted to make investments or trades based on the information provided.

106.    In a section titled, "Communicating Clearly and Responsibly," the Code of Conduct states the following:

We strengthen our brand and stakeholder relationships through clear, truthful, and consistent communications.

We communicate truthfully, accurately, and consistently with customers, investors, and other stakeholders. This shows respect and builds trust, and it helps us remain accountable to those we serve.

We are all ambassadors of Raytheon Technologies. Whether in person, by email, phone, or on social media, we communicate thoughtfully and respectfully. We recognize policy or legal limitations on what we may be permitted to say to external parties, and we let colleagues with the proper authority and experience handle external inquiries, such as media requests.

Communicating clearly and responsibly means that we:
• Are courteous and professional in all our communications, no matter what the medium;
• Never disclose classified, confidential, proprietary, or export/import-controlled information without authorization;
• Politely decline to provide details we are not authorized to disclose;
• Do not speak for the company unless specifically authorized;
• Refer media inquiries to Global Communications personnel; and
• Assume that anything we say to media representatives is on the record and could be taken out of context or distorted.

107.    In a section titled, "Working with Our Business Partners," the Code of Conduct

states the following:

Selecting and Collaborating with the Right Partners

We choose our business partners based on merit and shared values and treat them fairly.

We seek business partners who can help us achieve our goals by working collaboratively to provide expertise, resources, efficiency, and innovation. This helps us deliver excellent, reliable products on time and on budget. We expect partners to share our high ethical and safety standards and our passion for making a positive impact in the world.

Selecting and collaborating with the right partners means that we:
• Seek to do business with partners who best meet our needs and share our values;
• Evaluate partners on clear performance measures, such as quality, price, service, reliability, and availability;
• Conduct risk-based due diligence to ensure potential partners are qualified and reputable before onboarding;
• Monitor business partner performance on an ongoing basis;
• Expect our partners to uphold our values and comply with anti-bribery conventions and all other applicable laws;

• Treat all current and potential partners fairly and with integrity, regardless of the transaction value or length of the relationship;
• Avoid any conflicts of interest (or the appearance of them) by avoiding the selection of a partner based on friendships, family relationships, or financial interest;
• Do not accept inappropriate gifts, entertainment, or any kind of favoritism, which might compromise selection of the best partners for Raytheon Technologies;
• Formalize relationships in writing to provide transparency and accountability; and
• Seek opportunities for small, disadvantaged, minority-owned, woman-owned, veteran-owned, and historically under-used businesses.

108.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to engage in improper accounting practices, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof.  Moreover, seven of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

109.    Based in Waltham, Massachusetts, Raytheon is a global provider of high technology products and services to the aerospace industry specializing in defense and other government markets throughout the world. Specifically, Raytheon operations are classified into four principal business segments: (1) Pratt & Whitney; (2) Collins Aerospace Systems; (3) Raytheon Intelligence & Space; and (4) Raytheon Missiles & Defense.

110.    Pertinently, Raytheon Missiles & Defense segment designs, develops, integrates and produces missile and combat systems for the armed forces of the United States and allied nations. The segment is a purported leader in integrated air and missile defense; large land- and sea-based radar solutions command, control communications, computers, cyber and intelligence solutions; naval combat and ship electronic and sensing systems; and undersea sending and effects solutions.

111.    Raytheon was founded in 1922 and has grown internally and through a number of joint ventures, mergers and acquisitions since. Notably, in 2001, the Company formed a joint venture, TRS, with Thales—an aerospace and defense company that provides fully customized solutions through the integration of command and control centers, radars and communication networks.

112.    TRS touts itself as a leader in complex information systems, command and control, communications systems including terrestrial, satellite and voice communications, as well as long range air defense radars, tactical short to medium range air defense radars and weapon locating radars. TRS technological products include the Sentinel air defense and Firefinder weapon locating radar systems used by the U.S. Army and Marine Corps and over 20 allied nations, the Battle Command System air command and control system used by the U.S. Air Force and Canada, and the ACCS NATO air command and control system.

113.    TRS has two major operating subsidiaries: (1) Thales-Raytheon Systems Co. LLC ("TRS LLC"); and (2) Thales-Raytheon Systems Company S.A.S. ("TRS SAS"). TRS LLC formed a joint venture with TRS SAS called Air Command Systems International S.A.S., for which TRS LLC performs work.

114.    In 2019, Raytheon received a subpoena from the SEC seeking information in connection with the SEC Investigation into whether "improper payments" were made by TRS, or anyone acting on TRS's behalf, in connection with TRS or Raytheon contracts in certain countries in the Middle East. In early 2020, the DOJ opened the DOJ Investigation.

115.    On April 3, 2020, Raytheon and UTC completed a merger. The Company's common stock continued publicly trading on NYSE on April 3, 2020, under its new name, with its new leadership, and new ticker symbol. Notably, upon merger, the Company's Integrated Defense Systems and Missile Systems segments combined to form the Missiles & Defense segment.

### False and Misleading Statements

***February 10, 2016 Form 10-K***

116.    On February 10, 2016, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Kennedy, O'Brien, Wood, Atkinson, Beauchamp, Clark, Hadley, Long, Oliver, Spivey and non-party Michael C. Ruettgers ("Ruettgers"), and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

117.    With respect to the Company's "Responsibility for Financial Statements," the 2015 10-K stated the following, in relevant part:

> The financial statements and related information contained in this Annual Report have been prepared by and are the responsibility of our management. Our financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America and reflect judgments and estimates as to the expected effects of transactions and events currently being reported. Our management is responsible for the integrity and objectivity of the financial statements and other financial information included in this Annual Report. ***To meet***

*this responsibility, we maintain a system of internal control over financial reporting to provide reasonable assurance that assets are safeguarded and that transactions are properly executed and recorded. The system includes policies and procedures, internal audits and our officers' reviews*.

Our Audit Committee of our Board of Directors is composed solely of directors who are independent under applicable SEC and New York Stock Exchange rules. Our Audit Committee meets periodically and, when appropriate, separately with representatives of the independent registered public accounting firm, our officers and the internal auditors to monitor the activities of each.

(Emphasis added.)

118.   In a section titled "Management Report on Internal Control Over Financial Reporting," which was signed by Defendants Kennedy and O'Brien, the 2015 10-K stated the following, in relevant part:

Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. *In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in 2013*. The Company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. . . .

*Based on its assessment, management has concluded that the Company maintained effective internal control over financial reporting as of December 31, 2015, based on criteria in Internal Control – Integrated Framework, issued by the COSO in 2013*.

(Emphasis added.)

119.   The 2015 10-K stated the following regarding the Company's controls and procedures:

*Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of December 31, 2015 were effective*.

* * *

52

***Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the fourth quarter of 2015 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.***

(Emphasis added.)

120.   Pertaining to Raytheon's Integrated Defense Systems segment, which is now within the Company's Missiles & Defense segment, the 2015 10-K provided the following:

**Integrated Defense Systems**

| | | | | % Change | |
| --- | --- | --- | --- | --- | --- |
| (In millions, except percentages) | 2015 | 2014 | 2013 | 2015 compared to 2014 | 2014 compared to 2013 |
| Total net sales | $ 6,375 | $ 6,085 | $ 6,489 | 4.8 % | (6.2)% |
| Total operating expenses | | | | | |
| Cost of sales—labor | 2,051 | 2,039 | 2,272 | 0.6 % | (10.3)% |
| Cost of sales—materials and subcontractors | 2,424 | 2,096 | 2,149 | 15.6 % | (2.5)% |
| Other cost of sales and other operating expenses | 983 | 976 | 953 | 0.7 % | 2.4 % |
| Total operating expenses | 5,458 | 5,111 | 5,374 | 6.8 % | (4.9)% |
| Operating income | $ 917 | $ 974 | $ 1,115 | (5.9)% | (12.6)% |
| Operating margin | 14.4% | 16.0% | 17.2% | | |

121.   With respect to Raytheon's Missile Systems segment, which is now within the Company's Missiles & Defense segment, the 2015 10-K provided the following:

**Missile Systems**

| | | | | % Change | |
| --- | --- | --- | --- | --- | --- |
| (In millions, except percentages) | 2015 | 2014 | 2013 | 2015 compared to 2014 | 2014 compared to 2013 |
| Total net sales | $ 6,556 | $ 6,309 | $ 6,599 | 3.9% | (4.4)% |
| Total operating expenses | | | | | |
| Cost of sales—labor | 1,980 | 1,934 | 2,009 | 2.4% | (3.7)% |
| Cost of sales—materials and subcontractors | 2,739 | 2,640 | 2,720 | 3.8% | (2.9)% |
| Other cost of sales and other operating expenses | 970 | 935 | 1,040 | 3.7% | (10.1)% |
| Total operating expenses | 5,689 | 5,509 | 5,769 | 3.3% | (4.5)% |
| Operating income | $ 867 | $ 800 | $ 830 | 8.4% | (3.6)% |
| Operating margin | 13.2% | 12.7% | 12.6% | | |

*April 28, 2016 Form 10-Q*

122.    On April 28, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended April 3, 2016 (the "1Q16 10-Q"). The 1Q16 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

123.    The 1Q16 10-Q stated the following regarding the Company's controls and procedures:

> *Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of April 3, 2016 were effective.*
>
> * * *
>
> *Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the first quarter of 2016 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.*

(Emphasis added.)

124.    Pertaining to Raytheon's Integrated Defense Systems segment, which is now within the Company's Missiles & Defense segment, the 1Q16 10-Q provided the following:

**Integrated Defense Systems**

| | Three Months Ended | | |
|---|---|---|---|
| (In millions, except percentages) | Apr 3, 2016 | Mar 29, 2015 | % Change |
| Total net sales | $    1,337 | $    1,307 | 2.3 % |
| Total operating expenses | | | |
| Cost of sales—labor | 509 | 454 | 12.1 % |
| Cost of sales—materials and subcontractors | 453 | 478 | (5.2)% |
| Other cost of sales and other operating expenses | 228 | 192 | 18.8 % |
| Total operating expenses | 1,190 | 1,124 | 5.9 % |
| Operating income | $      147 | $      183 | (19.7)% |
| Operating margin | 11.0% | 14.0% | |

125.    With respect to Raytheon's Missile Systems segment, which is now within the Company's Missiles & Defense segment, the 1Q16 10-Q provided the following:

**Missile Systems**

| (In millions, except percentages) | | Three Months Ended | | | |
|---|---|---|---|---|---|
| | | Apr 3, 2016 | | Mar 29, 2015 | % Change |
| Total net sales | $ | 1,720 | $ | 1,473 | 16.8 % |
| Total operating expenses | | | | | |
| Cost of sales—labor | | 526 | | 480 | 9.6 % |
| Cost of sales—materials and subcontractors | | 646 | | 627 | 3.0 % |
| Other cost of sales and other operating expenses | | 356 | | 159 | 123.9 % |
| Total operating expenses | | 1,528 | | 1,266 | 20.7 % |
| Operating income | $ | 192 | $ | 207 | (7.2)% |
| Operating margin | | 11.2% | | 14.1% | |

***July 28, 2016 Form 10-Q***

126.    On July 28, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended July 3, 2016 (the "2Q16 10-Q"). The 2Q16 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

127.    The 2Q16 10-Q stated the following regarding the Company's controls and procedures:

> ***Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of July 3, 2016 were effective***.
>
> * * *
>
> ***Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the second quarter of 2016 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting***.

(Emphasis added.)

128.   Pertaining to Raytheon's Integrated Defense Systems segment, which is now within the Company's Missiles & Defense segment, the 2Q16 10-Q provided the following:

**Integrated Defense Systems**

| (In millions, except percentages) | Three Months Ended | | | Six Months Ended | | |
|---|---|---|---|---|---|---|
| | Jul 3, 2016 | Jun 28, 2015 | % Change | Jul 3, 2016 | Jun 28, 2015 | % Change |
| Total net sales | $ 1,399 | $ 1,565 | (10.6)% | $ 2,736 | $ 2,872 | (4.7)% |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 498 | 486 | 2.5 % | 1,007 | 940 | 7.1 % |
| Cost of sales—materials and subcontractors | 482 | 557 | (13.5)% | 935 | 1,035 | (9.7)% |
| Other cost of sales and other operating expenses | 44 | 320 | (86.3)% | 272 | 512 | (46.9)% |
| Total operating expenses | 1,024 | 1,363 | (24.9)% | 2,214 | 2,487 | (11.0)% |
| Operating income | $ 375 | $ 202 | 85.6 % | $ 522 | $ 385 | 35.6 % |
| Operating margin | 26.8% | 12.9% | | 19.1% | 13.4% | |

129.   With respect to Raytheon's Missile Systems segment, which is now within the Company's Missiles & Defense segment, the 2Q16 10-Q provided the following:

**Missile Systems**

| (In millions, except percentages) | Three Months Ended | | | Six Months Ended | | |
|---|---|---|---|---|---|---|
| | Jul 3, 2016 | Jun 28, 2015 | % Change | Jul 3, 2016 | Jun 28, 2015 | % Change |
| Total net sales | $ 1,656 | $ 1,559 | 6.2% | $ 3,376 | $ 3,032 | 11.3% |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 527 | 505 | 4.4% | 1,053 | 985 | 6.9% |
| Cost of sales—materials and subcontractors | 667 | 649 | 2.8% | 1,313 | 1,276 | 2.9% |
| Other cost of sales and other operating expenses | 239 | 221 | 8.1% | 595 | 380 | 56.6% |
| Total operating expenses | 1,433 | 1,375 | 4.2% | 2,961 | 2,641 | 12.1% |
| Operating income | $ 223 | $ 184 | 21.2% | $ 415 | $ 391 | 6.1% |
| Operating margin | 13.5% | 11.8% | | 12.3% | 12.9% | |

***October 27, 2016 Form 10-Q***

130.   On October 27, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended October 2, 2016 (the "3Q16 10-Q"). The 3Q16 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of

any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

131.   The 3Q16 10-Q stated the following regarding the Company's controls and procedures:

> ***Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of October 2, 2016 were effective***.
>
> \* \* \*
>
> ***Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the third quarter of 2016 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting***.

(Emphasis added.)

132.   Pertaining to Raytheon's Integrated Defense Systems segment, which is now within the Company's Missiles & Defense segment, the 3Q16 10-Q provided the following:

**Integrated Defense Systems**

| (In millions, except percentages) | Three Months Ended | | | Nine Months Ended | | |
|---|---|---|---|---|---|---|
| | Oct 2, 2016 | Sep 27, 2015 | % Change | Oct 2, 2016 | Sep 27, 2015 | % Change |
| Total net sales | $ 1,334 | $ 1,417 | (5.9)% | $ 4,070 | $ 4,289 | (5.1)% |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 487 | 470 | 3.6 % | 1,494 | 1,410 | 6.0 % |
| Cost of sales—materials and subcontractors | 436 | 540 | (19.3)% | 1,371 | 1,575 | (13.0)% |
| Other cost of sales and other operating expenses | 202 | 209 | (3.3)% | 474 | 721 | (34.3)% |
| Total operating expenses | 1,125 | 1,219 | (7.7)% | 3,339 | 3,706 | (9.9)% |
| Operating income | $ 209 | $ 198 | 5.6 % | $ 731 | $ 583 | 25.4 % |
| Operating margin | 15.7% | 14.0% | | 18.0% | 13.6% | |

133.   With respect to Raytheon's Missile Systems segment, which is now within the Company's Missiles & Defense segment, the 3Q16 10-Q provided the following:

**Missile Systems**

| (In millions, except percentages) | Three Months Ended | | | Nine Months Ended | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Oct 2, 2016 | Sep 27, 2015 | % Change | Oct 2, 2016 | Sep 27, 2015 | % Change |
| Total net sales | $ 1,800 | $ 1,645 | 9.4 % | $ 5,176 | $ 4,677 | 10.7% |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 533 | 492 | 8.3 % | 1,586 | 1,477 | 7.4% |
| Cost of sales—materials and subcontractors | 790 | 697 | 13.3 % | 2,103 | 1,973 | 6.6% |
| Other cost of sales and other operating expenses | 236 | 237 | (0.4)% | 831 | 617 | 34.7% |
| Total operating expenses | 1,559 | 1,426 | 9.3 % | 4,520 | 4,067 | 11.1% |
| Operating income | $ 241 | $ 219 | 10.0 % | $ 656 | $ 610 | 7.5% |
| Operating margin | 13.4% | 13.3% | | 12.7% | 13.0% | |

***February 15, 2017 Form 10-K***

134.    On February 15, 2017, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants Kennedy, O'Brien, Wood, Atkinson, Beauchamp, Clark, Hadley, Long, Oliver, Paliwal, Spivey, Winnefeld and non-party Ruettgers, and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

135.    With respect to the Company's "Responsibility for Financial Statements," the 2016 10-K stated the following, in relevant part:

> The financial statements and related information contained in this Annual Report have been prepared by and are the responsibility of our management. Our financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America and reflect judgments and estimates as to the expected effects of transactions and events currently being reported. Our management is responsible for the integrity and objectivity of the financial statements and other financial information included in this Annual Report. ***To meet this responsibility, we maintain a system of internal control over financial reporting to provide reasonable assurance that assets are safeguarded and that transactions are properly executed and recorded. The system includes policies and procedures, internal audits and our officers' reviews.***

> Our Audit Committee of our Board of Directors is composed solely of directors who are independent under applicable SEC and New York Stock Exchange rules. Our Audit Committee meets periodically and, when appropriate, separately with representatives of the independent registered public accounting firm, our officers and the internal auditors to monitor the activities of each.

(Emphasis added.)

136.   In a section titled "Management Report on Internal Control Over Financial Reporting," which was signed by Defendants Kennedy and O'Brien, the 2016 10-K stated the following, in relevant part:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. ***In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in 2013.*** The Company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. . . .
>
> ***Based on its assessment, management has concluded that the Company maintained effective internal control over financial reporting as of December 31, 2016, based on criteria in Internal Control – Integrated Framework, issued by the COSO in 2013.***

(Emphasis added.)

137.   The 2016 10-K stated the following regarding the Company's controls and procedures:

> ***Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of December 31, 2016 were effective.***
>
> \* \* \*
>
> ***Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the fourth quarter of 2016 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.***

(Emphasis added.)

138.    Pertaining to Raytheon's Integrated Defense Systems segment and Missile Systems, which are now within the Company's Missiles & Defense segment, the 2016 10-K provided the following:

| Total Net Sales (in millions) | | 2016 | | 2015 | | 2014 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 5,476 | $ | 5,847 | $ | 5,600 |
| Intelligence, Information and Services | | 6,194 | | 6,111 | | 6,222 |
| Missile Systems | | 7,071 | | 6,556 | | 6,309 |
| Space and Airborne Systems | | 6,199 | | 5,796 | | 6,075 |
| Forcepoint | | 566 | | 328 | | 104 |
| Eliminations | | (1,360) | | (1,330) | | (1,481) |
| Total business segment sales | | 24,146 | | 23,308 | | 22,829 |
| Acquisition Accounting Adjustments | | (77) | | (61) | | (3) |
| Total | $ | 24,069 | $ | 23,247 | $ | 22,826 |

* * *

| Operating Income (in millions) | | 2016 | | 2015 | | 2014 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 950 | $ | 864 | $ | 928 |
| Intelligence, Information and Services | | 467 | | 646 | | 532 |
| Missile Systems | | 916 | | 868 | | 801 |
| Space and Airborne Systems | | 817 | | 829 | | 886 |
| Forcepoint | | 51 | | 30 | | 11 |
| Eliminations | | (141) | | (140) | | (149) |
| Total business segment operating income | | 3,060 | | 3,097 | | 3,009 |
| Acquisition Accounting Adjustments | | (198) | | (168) | | (55) |
| FAS/CAS Adjustment | | 435 | | 185 | | 286 |
| Corporate | | (57) | | (101) | | (61) |
| Total | $ | 3,240 | $ | 3,013 | $ | 3,179 |

| Intersegment Operating Income (in millions) | | 2016 | | 2015 | | 2014 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 4 | $ | 2 | $ | 7 |
| Intelligence, Information and Services | | 65 | | 68 | | 67 |
| Missile Systems | | 12 | | 15 | | 14 |
| Space and Airborne Systems | | 46 | | 47 | | 52 |
| Forcepoint | | 14 | | 8 | | 9 |
| Total | $ | 141 | $ | 140 | $ | 149 |

* * *

| Capital Expenditures (in millions) | | 2016 | | 2015 | | 2014 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 135 | $ | 124 | $ | 95 |
| Intelligence, Information and Services | | 59 | | 87 | | 45 |
| Missile Systems | | 135 | | 62 | | 56 |
| Space and Airborne Systems | | 149 | | 131 | | 117 |
| Forcepoint | | 19 | | 10 | | — |
| Corporate | | 29 | | 11 | | 13 |
| Total[1] | $ | 526 | $ | 425 | $ | 326 |

(1)   Total capital expenditures may not agree to our consolidated statements of cash flows due to non-cash transactions.

* * *

| Depreciation and Amortization (in millions) | | 2016 | | 2015 | | 2014 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 88 | $ | 86 | $ | 90 |
| Intelligence, Information and Services | | 65 | | 48 | | 47 |
| Missile Systems | | 69 | | 74 | | 75 |
| Space and Airborne Systems | | 122 | | 131 | | 131 |
| Forcepoint | | 15 | | 8 | | 1 |
| Acquisition Accounting Adjustments | | 121 | | 107 | | 52 |
| Corporate | | 35 | | 35 | | 43 |
| Total | $ | 515 | $ | 489 | $ | 439 |

139.    With respect to Raytheon's Integrated Defense Systems segment, which is now within the Company's Missiles & Defense segment, the 2016 10-K provided the following:

**Integrated Defense Systems**

| | | | | | | | | % Change | |
|---|---|---|---|---|---|---|---|---|---|
| (In millions, except percentages) | | 2016 | | 2015 | | 2014 | | 2016 compared to 2015 | 2015 compared to 2014 |
| Total net sales | $ | 5,476 | $ | 5,847 | $ | 5,600 | | (6.3)% | 4.4 % |
| Total operating expenses | | | | | | | | | |
| Cost of sales—labor | | 1,967 | | 1,895 | | 1,880 | | 3.8 % | 0.8 % |
| Cost of sales—materials and subcontractors | | 1,849 | | 2,164 | | 1,867 | | (14.6)% | 15.9 % |
| Other cost of sales and other operating expenses | | 710 | | 924 | | 925 | | (23.2)% | (0.1)% |
| Total operating expenses | | 4,526 | | 4,983 | | 4,672 | | (9.2)% | 6.7 % |
| Operating income | $ | 950 | $ | 864 | $ | 928 | | 10.0 % | (6.9)% |
| Operating margin | | 17.3% | | 14.8% | | 16.6% | | | |

140.    With respect to Raytheon's Missile Systems segment, which is now within the Company's Missiles & Defense segment, the 2016 10-K provided the following:

**Missile Systems**

| (In millions, except percentages) | | 2016 | | 2015 | | 2014 | 2016 compared to 2015 | 2015 compared to 2014 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | % Change | |
| Total net sales | $ | 7,071 | $ | 6,556 | $ | 6,309 | 7.9% | 3.9% |
| Total operating expenses | | | | | | | | |
| Cost of sales—labor | | 2,101 | | 1,980 | | 1,934 | 6.1% | 2.4% |
| Cost of sales—materials and subcontractors | | 2,928 | | 2,739 | | 2,640 | 6.9% | 3.8% |
| Other cost of sales and other operating expenses | | 1,126 | | 969 | | 934 | 16.2% | 3.7% |
| Total operating expenses | | 6,155 | | 5,688 | | 5,508 | 8.2% | 3.3% |
| Operating income | $ | 916 | $ | 868 | $ | 801 | 5.5% | 8.4% |
| Operating margin | | 13.0% | | 13.2% | | 12.7% | | |

*April 27, 2017 Form 10-Q*

141.    On April 27, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended April 2, 2017 (the "1Q17 10-Q"). The 1Q17 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

142.    The 1Q17 10-Q stated the following regarding the Company's controls and procedures:

> *Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of April 2, 2017 were effective.*
>
> * * *
>
> *Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the first quarter of 2017 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.*

(Emphasis added.)

143.    Pertaining to Raytheon's Integrated Defense Systems segment, which is now within the Company's Missiles & Defense segment, the 1Q17 10-Q provided the following:

**Integrated Defense Systems**

| (In millions, except percentages) | | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Apr 2, 2017 | | Apr 3, 2016 | | % Change |
| Total net sales | $ | 1,398 | $ | 1,336 | | 4.6 % |
| Total operating expenses | | | | | | |
| Cost of sales—labor | | 535 | | 509 | | 5.1 % |
| Cost of sales—materials and subcontractors | | 419 | | 453 | | (7.5)% |
| Other cost of sales and other operating expenses | | 232 | | 228 | | 1.8 % |
| Total operating expenses | | 1,186 | | 1,190 | | (0.3)% |
| Operating income | $ | 212 | $ | 146 | | 45.2 % |
| Operating margin | | 15.2% | | 10.9% | | |

144.    With respect to Raytheon's Missile Systems segment, which is now within the Company's Missiles & Defense segment, the 1Q17 10-Q provided the following:

**Missile Systems**

| (In millions, except percentages) | | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Apr 2, 2017 | | Apr 3, 2016 | | % Change |
| Total net sales | $ | 1,756 | $ | 1,723 | | 1.9 % |
| Total operating expenses | | | | | | |
| Cost of sales—labor | | 549 | | 526 | | 4.4 % |
| Cost of sales—materials and subcontractors | | 781 | | 647 | | 20.7 % |
| Other cost of sales and other operating expenses | | 210 | | 358 | | (41.3)% |
| Total operating expenses | | 1,540 | | 1,531 | | 0.6 % |
| Operating income | $ | 216 | $ | 192 | | 12.5 % |
| Operating margin | | 12.3% | | 11.1% | | |

### *July 27, 2017 Form 10-Q*

145.    On July 27, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended July 2, 2017 (the "2Q17 10-Q"). The 2Q17 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

146.    The 2Q17 10-Q stated the following regarding the Company's controls and procedures:

*Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of July 2, 2017 were effective*.

\* \* \*

*Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the second quarter of 2017 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting*.

(Emphasis added.)

147.     Pertaining to Raytheon's Integrated Defense Systems segment, which is now within the Company's Missiles & Defense segment, the 2Q17 10-Q provided the following:

**Integrated Defense Systems**

| (In millions, except percentages) | Three Months Ended | | | Six Months Ended | | |
|---|---|---|---|---|---|---|
| | Jul 2, 2017 | Jul 3, 2016 | % Change | Jul 2, 2017 | Jul 3, 2016 | % Change |
| Total net sales | $ 1,462 | $ 1,399 | 4.5 % | $ 2,860 | $ 2,735 | 4.6 % |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 530 | 498 | 6.4 % | 1,065 | 1,007 | 5.8 % |
| Cost of sales—materials and subcontractors | 465 | 482 | (3.5)% | 884 | 935 | (5.5)% |
| Other cost of sales and other operating expenses | 222 | 43 | 416.3 % | 454 | 271 | 67.5 % |
| Total operating expenses | 1,217 | 1,023 | 19.0 % | 2,403 | 2,213 | 8.6 % |
| Operating income | $ 245 | $ 376 | (34.8)% | $ 457 | $ 522 | (12.5)% |
| Operating margin | 16.8% | 26.9% | | 16.0% | 19.1% | |

148.     With respect to Raytheon's Missile Systems segment, which is now within the Company's Missiles & Defense segment, the 2Q17 10-Q provided the following:

**Missile Systems**

| (In millions, except percentages) | Three Months Ended | | | Six Months Ended | | |
|---|---|---|---|---|---|---|
| | Jul 2, 2017 | Jul 3, 2016 | % Change | Jul 2, 2017 | Jul 3, 2016 | % Change |
| Total net sales | $ 1,901 | $ 1,706 | 11.4% | $ 3,657 | $ 3,429 | 6.6 % |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 561 | 528 | 6.3% | 1,110 | 1,054 | 5.3 % |
| Cost of sales—materials and subcontractors | 845 | 706 | 19.7% | 1,626 | 1,353 | 20.2 % |
| Other cost of sales and other operating expenses | 259 | 239 | 8.4% | 469 | 597 | (21.4)% |
| Total operating expenses | 1,665 | 1,473 | 13.0% | 3,205 | 3,004 | 6.7 % |
| Operating income | $ 236 | $ 233 | 1.3% | $ 452 | $ 425 | 6.4 % |
| Operating margin | 12.4% | 13.7% | | 12.4% | 12.4% | |

### October 26, 2017 Form 10-Q

149.    On October 26, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended October 1, 2017 (the "3Q17 10-Q"). The 3Q17 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

150.    The 3Q17 10-Q stated the following regarding the Company's controls and procedures:

> *Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of October 1, 2017 were effective*.
>
> * * *
>
> *Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the third quarter of 2017 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting*.

(Emphasis added.)

151.    Pertaining to Raytheon's Integrated Defense Systems segment, which is now within the Company's Missiles & Defense segment, the 3Q17 10-Q provided the following:

**Integrated Defense Systems**

| (In millions, except percentages) | Three Months Ended | | | Nine Months Ended | | |
|---|---|---|---|---|---|---|
| | Oct 1, 2017 | Oct 2, 2016 | % Change | Oct 1, 2017 | Oct 2, 2016 | % Change |
| Total net sales | $ 1,391 | $ 1,334 | 4.3 % | $ 4,251 | $ 4,069 | 4.5 % |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 532 | 487 | 9.2 % | 1,597 | 1,494 | 6.9 % |
| Cost of sales—materials and subcontractors | 420 | 436 | (3.7)% | 1,304 | 1,371 | (4.9)% |
| Other cost of sales and other operating expenses | 208 | 200 | 4.0 % | 662 | 471 | 40.6 % |
| Total operating expenses | 1,160 | 1,123 | 3.3 % | 3,563 | 3,336 | 6.8 % |
| Operating income | $ 231 | $ 211 | 9.5 % | $ 688 | $ 733 | (6.1)% |
| Operating margin | 16.6% | 15.8% | | 16.2% | 18.0% | |

| Change in Operating Income (in millions) | Three Months Ended Oct 1, 2017 Versus Three Months Ended Oct 2, 2016 | | Nine Months Ended Oct 1, 2017 Versus Nine Months Ended Oct 2, 2016 | |
|---|---|---|---|---|
| Volume | $ | 6 | $ | 11 |
| Net change in EAC adjustments | | 12 | | 57 |
| Mix and other performance | | 2 | | (113) |
| Total change in operating income | $ | 20 | $ | (45) |

152.     With respect to Raytheon's Missile Systems segment, which is now within the Company's Missiles & Defense segment, the 3Q17 10-Q provided the following:

**Missile Systems**

| (In millions, except percentages) | Three Months Ended | | | Nine Months Ended | | |
|---|---|---|---|---|---|---|
| | Oct 1, 2017 | Oct 2, 2016 | % Change | Oct 1, 2017 | Oct 2, 2016 | % Change |
| Total net sales | $ 1,945 | $ 1,770 | 9.9% | $ 5,602 | $ 5,199 | 7.8 % |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 596 | 528 | 12.9% | 1,706 | 1,582 | 7.8 % |
| Cost of sales—materials and subcontractors | 787 | 770 | 2.2% | 2,413 | 2,123 | 13.7 % |
| Other cost of sales and other operating expenses | 282 | 237 | 19.0% | 751 | 834 | (10.0)% |
| Total operating expenses | 1,665 | 1,535 | 8.5% | 4,870 | 4,539 | 7.3 % |
| Operating income | $ 280 | $ 235 | 19.1% | $ 732 | $ 660 | 10.9 % |
| Operating margin | 14.4% | 13.3% | | 13.1% | 12.7% | |

***February 14, 2018 Form 10-K***

153.     On February 14, 2018, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Kennedy, O'Brien, Wood, Atkinson, Beauchamp, Clark, Hadley, Long, Oliver, Paliwal, Spivey, Winnefeld, and Work and contained SOX certifications signed by Defendants

Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

154.    With respect to the Company's "Responsibility for Financial Statements," the 2017 10-K stated the following, in relevant part:

> The financial statements and related information contained in this Annual Report have been prepared by and are the responsibility of our management. Our financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America and reflect judgments and estimates as to the expected effects of transactions and events currently being reported. Our management is responsible for the integrity and objectivity of the financial statements and other financial information included in this Annual Report. ***To meet this responsibility, we maintain a system of internal control over financial reporting to provide reasonable assurance that assets are safeguarded and that transactions are properly executed and recorded. The system includes policies and procedures, internal audits and our officers' reviews***.

> Our Audit Committee of our Board of Directors is composed solely of directors who are independent under applicable Securities and Exchange Commission (SEC) and New York Stock Exchange rules. Our Audit Committee meets periodically and, when appropriate, separately with representatives of the independent registered public accounting firm, our officers and the internal auditors to monitor the activities of each.

(Emphasis added.)

155.    In a section titled "Management Report on Internal Control Over Financial Reporting," which was signed by Defendants Kennedy and O'Brien, the 2017 10-K stated the following, in relevant part:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in 2013. The Company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in

accordance with accounting principles generally accepted in the United States of America. . . .

**Based on its assessment, management has concluded that the Company maintained effective internal control over financial reporting as of December 31, 2017, based on criteria in Internal Control – Integrated Framework, issued by the COSO in 2013.**

(Emphasis added.)

156.    The 2017 10-K stated the following regarding the Company's controls and procedures:

**Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of December 31, 2017 were effective.**

\* \* \*

**Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the fourth quarter of 2017 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.**

(Emphasis added.)

157.    Pertaining to Raytheon's Integrated Defense Systems segment and Missile Systems, which are now within the Company's Missiles & Defense segment, the 2017 10-K provided the following:

| Total Net Sales (in millions) | | 2017 | | 2016 | | 2015 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 5,804 | $ | 5,529 | $ | 5,848 |
| Intelligence, Information and Services | | 6,177 | | 6,169 | | 6,137 |
| Missile Systems | | 7,787 | | 7,096 | | 6,569 |
| Space and Airborne Systems | | 6,430 | | 6,182 | | 5,814 |
| Forcepoint | | 608 | | 586 | | 344 |
| Eliminations | | (1,423) | | (1,361) | | (1,330) |
| Total business segment sales | | 25,383 | | 24,201 | | 23,382 |
| Acquisition Accounting Adjustments | | (35) | | (77) | | (61) |
| Total | $ | 25,348 | $ | 24,124 | $ | 23,321 |

| Intersegment Sales (in millions) | | 2017 | | 2016 | | 2015 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 64 | $ | 69 | $ | 64 |
| Intelligence, Information and Services | | 666 | | 657 | | 624 |
| Missile Systems | | 132 | | 122 | | 143 |
| Space and Airborne Systems | | 540 | | 493 | | 484 |
| Forcepoint | | 21 | | 20 | | 15 |
| Total | $ | 1,423 | $ | 1,361 | $ | 1,330 |

\* \* \*

| Operating Income (in millions) | | 2017 | | 2016 | | 2015 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 935 | $ | 971 | $ | 859 |
| Intelligence, Information and Services | | 455 | | 467 | | 648 |
| Missile Systems | | 1,010 | | 921 | | 877 |
| Space and Airborne Systems | | 862 | | 808 | | 851 |
| Forcepoint | | 33 | | 90 | | 56 |
| Eliminations | | (148) | | (142) | | (140) |
| Total business segment operating income | | 3,147 | | 3,115 | | 3,151 |
| Acquisition Accounting Adjustments | | (160) | | (198) | | (168) |
| FAS/CAS Adjustment | | 390 | | 435 | | 185 |
| Corporate | | (59) | | (57) | | (101) |
| Total | $ | 3,318 | $ | 3,295 | $ | 3,067 |

\* \* \*

| Capital Expenditures (in millions) | | 2017 | | 2016 | | 2015 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 200 | $ | 135 | $ | 124 |
| Intelligence, Information and Services | | 22 | | 59 | | 87 |
| Missile Systems | | 221 | | 135 | | 62 |
| Space and Airborne Systems | | 158 | | 149 | | 131 |
| Forcepoint | | 14 | | 19 | | 10 |
| Corporate | | 19 | | 29 | | 11 |
| Total[(1)] | $ | 634 | $ | 526 | $ | 425 |

(1)   Total capital expenditures may not agree to our consolidated statements of cash flows due to non-cash transactions.

| Depreciation and Amortization (in millions) | | 2017 | | 2016 | | 2015 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 98 | $ | 88 | $ | 86 |
| Intelligence, Information and Services | | 50 | | 65 | | 48 |
| Missile Systems | | 84 | | 69 | | 74 |
| Space and Airborne Systems | | 132 | | 122 | | 131 |
| Forcepoint | | 17 | | 15 | | 8 |
| Acquisition Accounting Adjustments | | 125 | | 121 | | 107 |
| Corporate | | 44 | | 35 | | 35 |
| Total | $ | 550 | $ | 515 | $ | 489 |

158.   With respect to Raytheon's Integrated Defense Systems segment, which is now within the Company's Missiles & Defense segment, the 2017 10-K provided the following:

**Integrated Defense Systems**

| | | | | | | % Change | |
|---|---|---|---|---|---|---|---|
| (In millions, except percentages) | | 2017 | | 2016 | | 2015 | 2017 compared to 2016 | 2016 compared to 2015 |
| Total net sales | $ | 5,804 | $ | 5,529 | $ | 5,848 | 5.0 % | (5.5)% |
| Total operating expenses | | | | | | | | |
| Cost of sales—labor | | 2,138 | | 1,983 | | 1,896 | 7.8 % | 4.6 % |
| Cost of sales—materials and subcontractors | | 1,845 | | 1,867 | | 2,164 | (1.2)% | (13.7)% |
| Other cost of sales and other operating expenses | | 886 | | 708 | | 929 | 25.1 % | (23.8)% |
| Total operating expenses | | 4,869 | | 4,558 | | 4,989 | 6.8 % | (8.6)% |
| Operating income | $ | 935 | $ | 971 | $ | 859 | (3.7)% | 13.0 % |
| Operating margin | | 16.1% | | 17.6% | | 14.7% | | |

159.   With respect to Raytheon's Missile Systems segment, which is now within the Company's Missiles & Defense segment, the 2017 10-K provided the following:

**Missile Systems**

| (In millions, except percentages) | | 2017 | | 2016 | | 2015 | 2017 compared to 2016 | 2016 compared to 2015 |
|---|---|---|---|---|---|---|---|---|
| Total net sales | $ | 7,787 | $ | 7,096 | $ | 6,569 | 9.7 % | 8.0% |
| Total operating expenses | | | | | | | | |
| Cost of sales—labor | | 2,303 | | 2,097 | | 1,980 | 9.8 % | 5.9% |
| Cost of sales—materials and subcontractors | | 3,386 | | 2,949 | | 2,749 | 14.8 % | 7.3% |
| Other cost of sales and other operating expenses | | 1,088 | | 1,129 | | 963 | (3.6)% | 17.2% |
| Total operating expenses | | 6,777 | | 6,175 | | 5,692 | 9.7 % | 8.5% |
| Operating income | $ | 1,010 | $ | 921 | $ | 877 | 9.7 % | 5.0% |
| Operating margin | | 13.0% | | 13.0% | | 13.4% | | |

*% Change* is the heading spanning the final two columns.

***April 17, 2018 Proxy Statement***

160.     On April 17, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Kennedy, Atkinson, Beauchamp, Clark, Hadley, Long, Oliver, Paliwal, Spivey, Winnefeld, and Work solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[11]

161.     With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated "[a]ll officers, directors, employees and representatives are required to comply with the Code of Conduct, and are subject to disciplinary action, including termination, for failure to do so" and that the Code of Conduct is "the foundation of [Raytheon's] ethics and compliance program."

162.     The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

---

[11] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

163.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including linking incentive award opportunities "to ensure that the interests of executives are closely aligned with those of shareholders" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

164.    The 2018 Proxy Statement also called for shareholder approval of, among other things: (1) the election of twelve directors; (2) advisory vote to approve named executive officer compensation; (3) ratification of the Company's independent auditors; and (4) the rejection of a shareholder proposal seeking to decrease the average amount of Company common stock the average member of a nominating group would be required to hold for 3-years to satisfy the aggregate requirements to form a nominating group and to increase the possible number of proxy access director candidates (the "2018 Shareholder Proposal").

165.    The 2018 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company failed to maintain adequate disclosure controls and procedures and failed to maintain internal controls over financial reporting; (2) the Company's financial accounting methods were defective; (3) consequently, the Company failed to appropriately report Raytheon's expenditures relating to the Company's Missiles & Defense business since, at least, 2009; (4) accordingly, the Company was subjected to a heightened risk for governmental scrutiny; and (5) thus, the DOJ would commence a criminal investigation into Raytheon. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

*April 26, 2018 Form 10-Q*

166.    On April 26, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended April 1, 2018 (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

167.    The 1Q18 10-Q stated the following regarding the Company's controls and procedures:

> *Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of April 1, 2018 were effective.*
>
> * * *
>
> *Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the first quarter of 2018 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.*

(Emphasis added.)

168.    Pertaining to Raytheon's Integrated Defense Systems segment, which is now within the Company's Missiles & Defense segment, the 1Q18 10-Q provided the following:

**Integrated Defense Systems**

| (In millions, except percentages) | Three Months Ended | | |
| --- | --- | --- | --- |
| | Apr 1, 2018 | Apr 2, 2017 | % Change |
| Total net sales | $   1,489 | $   1,398 | 6.5 % |
| Total operating expenses | | | |
|    Cost of sales—labor | 553 | 535 | 3.4 % |
|    Cost of sales—materials and subcontractors | 466 | 419 | 11.2 % |
|    Other cost of sales and other operating expenses | 197 | 232 | (15.1)% |
| Total operating expenses | 1,216 | 1,186 | 2.5 % |
| Operating income | $   273 | $   212 | 28.8 % |
| Operating margin | 18.3% | 15.2% | |

169.    With respect to Raytheon's Missile Systems segment, which is now within the Company's Missiles & Defense segment, the 1Q18 10-Q provided the following:

**Missile Systems**

| (In millions, except percentages) | | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Apr 1, 2018 | | Apr 2, 2017 | | % Change |
| Total net sales | $ | 1,848 | $ | 1,756 | | 5.2 % |
| Total operating expenses | | | | | | |
| Cost of sales—labor | | 622 | | 549 | | 13.3 % |
| Cost of sales—materials and subcontractors | | 826 | | 781 | | 5.8 % |
| Other cost of sales and other operating expenses | | 188 | | 210 | | (10.5)% |
| Total operating expenses | | 1,636 | | 1,540 | | 6.2 % |
| Operating income | $ | 212 | $ | 216 | | (1.9)% |
| Operating margin | | 11.5% | | 12.3% | | |

### July 26, 2018 Form 10-Q

170.    On July 26, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended July 1, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

171.    The 2Q18 10-Q stated the following regarding the Company's controls and procedures:

> *Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of July 1, 2018 were effective.*
>
> * * *
>
> *Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the second quarter of 2018 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.*

(Emphasis added.)

172.    Pertaining to Raytheon's Integrated Defense Systems segment, which is now within the Company's Missiles & Defense segment, the 2Q18 10-Q provided the following:

**Integrated Defense Systems**

| (In millions, except percentages) | Three Months Ended | | | Six Months Ended | | |
|---|---|---|---|---|---|---|
| | Jul 1, 2018 | Jul 2, 2017 | % Change | Jul 1, 2018 | Jul 2, 2017 | % Change |
| Total net sales | $ 1,514 | $ 1,462 | 3.6% | $ 3,003 | $ 2,860 | 5.0 % |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 540 | 530 | 1.9% | 1,093 | 1,065 | 2.6 % |
| Cost of sales—materials and subcontractors | 478 | 465 | 2.8% | 944 | 884 | 6.8 % |
| Other cost of sales and other operating expenses | 234 | 222 | 5.4% | 431 | 454 | (5.1)% |
| Total operating expenses | 1,252 | 1,217 | 2.9% | 2,468 | 2,403 | 2.7 % |
| Operating income | $ 262 | $ 245 | 6.9% | $ 535 | $ 457 | 17.1 % |
| Operating margin | 17.3% | 16.8% | | 17.8% | 16.0% | |

173.    With respect to Raytheon's Missile Systems segment, which is now within the Company's Missiles & Defense segment, the 2Q18 10-Q provided the following:

**Missile Systems**

| (In millions, except percentages) | Three Months Ended | | | Six Months Ended | | |
|---|---|---|---|---|---|---|
| | Jul 1, 2018 | Jul 2, 2017 | % Change | Jul 1, 2018 | Jul 2, 2017 | % Change |
| Total net sales | $ 2,051 | $ 1,901 | 7.9 % | $ 3,899 | $ 3,657 | 6.6 % |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 637 | 561 | 13.5 % | 1,259 | 1,110 | 13.4 % |
| Cost of sales—materials and subcontractors | 888 | 845 | 5.1 % | 1,714 | 1,626 | 5.4 % |
| Other cost of sales and other operating expenses | 295 | 259 | 13.9 % | 483 | 469 | 3.0 % |
| Total operating expenses | 1,820 | 1,665 | 9.3 % | 3,456 | 3,205 | 7.8 % |
| Operating income | $ 231 | $ 236 | (2.1)% | $ 443 | $ 452 | (2.0)% |
| Operating margin | 11.3% | 12.4% | | 11.4% | 12.4% | |

***October 25, 2018 Form 10-Q***

174.    On October 25, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of

any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

175.    The 3Q18 10-Q stated the following regarding the Company's controls and procedures:

> *Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of September 30, 2018 were effective*.
>
> * * *
>
> *Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the third quarter of 2018 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting*.

(Emphasis added.)

176.    Pertaining to Raytheon's Integrated Defense Systems segment, which is now within the Company's Missiles & Defense segment, the 3Q18 10-Q provided the following:

**Integrated Defense Systems**

| (In millions, except percentages) | Three Months Ended | | | Nine Months Ended | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Sep 30, 2018 | Oct 1, 2017 | % Change | Sep 30, 2018 | Oct 1, 2017 | % Change |
| Total net sales | $   1,493 | $   1,391 | 7.3% | $   4,496 | $   4,251 | 5.8 % |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 534 | 532 | 0.4% | 1,627 | 1,597 | 1.9 % |
| Cost of sales—materials and subcontractors | 493 | 420 | 17.4% | 1,437 | 1,304 | 10.2 % |
| Other cost of sales and other operating expenses | 225 | 208 | 8.2% | 656 | 662 | (0.9)% |
| Total operating expenses | 1,252 | 1,160 | 7.9% | 3,720 | 3,563 | 4.4 % |
| Operating income | $   241 | $   231 | 4.3% | $   776 | $   688 | 12.8 % |
| Operating margin | 16.1% | 16.6% | | 17.3% | 16.2% | |

177.    With respect to Raytheon's Missile Systems segment, which is now within the Company's Missiles & Defense segment, the 3Q18 10-Q provided the following:

**Missile Systems**

| (In millions, except percentages) | Three Months Ended | | | Nine Months Ended | | |
|---|---|---|---|---|---|---|
| | Sep 30, 2018 | Oct 1, 2017 | % Change | Sep 30, 2018 | Oct 1, 2017 | % Change |
| Total net sales | $   2,082 | $   1,945 | 7.0 % | $   5,981 | $   5,602 | 6.8 % |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 638 | 596 | 7.0 % | 1,897 | 1,706 | 11.2 % |
| Cost of sales—materials and subcontractors | 915 | 787 | 16.3 % | 2,629 | 2,413 | 9.0 % |
| Other cost of sales and other operating expenses | 272 | 282 | (3.5)% | 755 | 751 | 0.5 % |
| Total operating expenses | 1,825 | 1,665 | 9.6 % | 5,281 | 4,870 | 8.4 % |
| Operating income | $   257 | $   280 | (8.2)% | $   700 | $   732 | (4.4)% |
| Operating margin | 12.3% | 14.4% | | 11.7% | 13.1% | |

***February 13, 2019 Form 10-K***

178.    On February 13, 2019, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Kennedy, O'Brien, Wood, Atkinson, Beauchamp, Brown, Clark, Hadley, Long, Oliver, Paliwal, Pawlikowski, Spivey, Stewart, Winnefeld, and Work and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

179.    With respect to the Company's "Responsibility for Financial Statements," the 2018 10-K stated the following, in relevant part:

> The financial statements and related information contained in this Annual Report have been prepared by and are the responsibility of our management. Our financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America and reflect judgments and estimates as to the expected effects of transactions and events currently being reported. Our management is responsible for the integrity and objectivity of the financial statements and other financial information included in this Annual Report. ***To meet this responsibility, we maintain a system of internal control over financial reporting to provide reasonable assurance that assets are safeguarded and that transactions are properly executed and recorded. The system includes policies and procedures, internal audits and our officers' reviews***.
>
> Our Audit Committee of our Board of Directors is composed solely of directors who are independent under applicable Securities and Exchange Commission (SEC)

and New York Stock Exchange rules. Our Audit Committee meets periodically and, when appropriate, separately with representatives of the independent registered public accounting firm, our officers and the internal auditors to monitor the activities of each.

(Emphasis added.)

180.    In a section titled "Management Report on Internal Control Over Financial Reporting," which was signed by Defendants Kennedy and O'Brien, the 2018 10-K stated the following, in relevant part:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in 2013. The Company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. . . .
>
> **Based on its assessment, management has concluded that the Company maintained effective internal control over financial reporting as of December 31, 2018, based on criteria in Internal Control – Integrated Framework, issued by the COSO in 2013**.

(Emphasis added.)

181.    The 2018 10-K stated the following regarding the Company's controls and procedures:

> **Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of December 31, 2018 were effective**.
>
> * * *
>
> **Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the fourth quarter of 2018 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting**.

(Emphasis added.)

182.    Pertaining to Raytheon's Integrated Defense Systems segment and Missile Systems, which are now within the Company's Missiles & Defense segment, the 2018 10-K provided the following:

| Total Net Sales (in millions) | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|
| Integrated Defense Systems | $ 6,180 | $ | 5,804 | $ | 5,529 |
| Intelligence, Information and Services | 6,722 | | 6,177 | | 6,169 |
| Missile Systems | 8,298 | | 7,787 | | 7,096 |
| Space and Airborne Systems | 6,748 | | 6,430 | | 6,182 |
| Forcepoint | 634 | | 608 | | 586 |
| Eliminations | (1,514) | | (1,423) | | (1,361) |
| Total business segment sales | 27,068 | | 25,383 | | 24,201 |
| Acquisition Accounting Adjustments | (10) | | (35) | | (77) |
| Total | $ 27,058 | | $ 25,348 | | $ 24,124 |

| Intersegment Sales (in millions) | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|
| Integrated Defense Systems | $ 65 | $ | 64 | $ | 69 |
| Intelligence, Information and Services | 666 | | 666 | | 657 |
| Missile Systems | 161 | | 132 | | 122 |
| Space and Airborne Systems | 596 | | 540 | | 493 |
| Forcepoint | 26 | | 21 | | 20 |
| Total | $ 1,514 | $ | 1,423 | $ | 1,361 |

| Operating Income (in millions) | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|
| Integrated Defense Systems | $ 1,023 | $ | 935 | $ | 971 |
| Intelligence, Information and Services | 538 | | 455 | | 467 |
| Missile Systems | 973 | | 1,010 | | 921 |
| Space and Airborne Systems | 884 | | 862 | | 808 |
| Forcepoint | 5 | | 33 | | 90 |
| Eliminations | (170) | | (148) | | (142) |
| Total business segment operating income | 3,253 | | 3,147 | | 3,115 |
| Acquisition Accounting Adjustments | (126) | | (160) | | (198) |
| FAS/CAS Operating Adjustment | 1,428 | | 1,303 | | 1,036 |
| Corporate | (17) | | (59) | | (57) |
| Total | $ 4,538 | $ | 4,231 | $ | 3,896 |

| Intersegment Operating Income (in millions) | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|
| Integrated Defense Systems | $ 6 | $ | 5 | $ | 4 |
| Intelligence, Information and Services | 68 | | 64 | | 65 |
| Missile Systems | 15 | | 13 | | 12 |
| Space and Airborne Systems | 60 | | 51 | | 46 |
| Forcepoint | 21 | | 15 | | 15 |
| Total | $ 170 | $ | 148 | $ | 142 |

* * *

| Capital Expenditures (in millions) | | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 242 | $ | 200 | $ | 135 |
| Intelligence, Information and Services | | 46 | | 22 | | 59 |
| Missile Systems | | 337 | | 221 | | 135 |
| Space and Airborne Systems | | 136 | | 158 | | 149 |
| Forcepoint | | 13 | | 14 | | 19 |
| Corporate | | 24 | | 19 | | 29 |
| Total[(1)] | $ | 798 | $ | 634 | $ | 526 |

(1)   Total capital expenditures may not agree to our consolidated statements of cash flows due to non-cash transactions.

| Depreciation and Amortization (in millions) | | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 98 | $ | 98 | $ | 88 |
| Intelligence, Information and Services | | 51 | | 50 | | 65 |
| Missile Systems | | 98 | | 84 | | 69 |
| Space and Airborne Systems | | 140 | | 132 | | 122 |
| Forcepoint | | 17 | | 17 | | 15 |
| Acquisition Accounting Adjustments | | 116 | | 125 | | 121 |
| Corporate | | 48 | | 44 | | 35 |
| Total | $ | 568 | $ | 550 | $ | 515 |

### *April 16, 2019 Proxy Statement*

183.    On April 16, 2019, the Company filed a Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Kennedy, Atkinson, Beauchamp, Brown, Clark, Hadley, Long, Oliver, Paliwal, Pawlikowski, Spivey, Stewart, Winnefeld, and Work solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[12]

184.    With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated "[a]ll officers, directors, employees and representatives are required to comply with the Code of

---

[12] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Conduct, and are subject to disciplinary action, including termination, for failure to do so" and that the Code of Conduct is "the foundation of [Raytheon's] ethics and compliance program."

185.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

186.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including linking incentive award opportunities "to align [executive compensation] with shareholder interests[]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

187.    The 2019 Proxy Statement also called for shareholder approval of, among other things: (1) the election of thirteen directors; (2) advisory vote to approve named executive officer compensation; (3) a long-term incentive plan, the Raytheon 2019 Stock Plan, designed to encourage Raytheon's officers, employees, non-employee directors, and consultants to, among other things, own Raytheon common stock by including a replenished reserve of up to 8,673,643 shares of Company common stock (the "2019 Proposal, and together with the 2018 Shareholder Proposal, the "Proposals"); and (4) ratification of the Company's independent auditors.

188.    The 2019 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company failed to maintain adequate disclosure controls and procedures and failed to maintain internal controls over financial reporting; (2) the Company's financial accounting methods were defective; (3)

consequently, the Company failed to appropriately report Raytheon's expenditures relating to the Company's Missiles & Defense business since, at least, 2009; (4) accordingly, the Company was subjected to a heightened risk for governmental scrutiny; and (5) thus, the DOJ would commence a criminal investigation into Raytheon.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### April 25, 2019 Form 10-Q

189.    On April 25, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

190.    The 1Q19 10-Q stated the following regarding the Company's controls and procedures:

> *Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of March 31, 2019 were effective*.
>
> * * *
>
> *Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the first quarter of 2019 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting*.

(Emphasis added.)

191.    Pertaining to Raytheon's Integrated Defense Systems segment, which is now within the Company's Missiles & Defense segment, the 1Q19 10-Q provided the following:

**Integrated Defense Systems**

| (In millions, except percentages) | Three Months Ended | | |
| --- | --- | --- | --- |
| | Mar 31, 2019 | Apr 1, 2018 | % Change |
| Total net sales | $  1,550 | $  1,489 | 4.1 % |
| Total operating expenses | | | |
| Cost of sales—labor | 543 | 553 | (1.8)% |
| Cost of sales—materials and subcontractors | 503 | 466 | 7.9 % |
| Other cost of sales and other operating expenses | 246 | 197 | 24.9 % |
| Total operating expenses | 1,292 | 1,216 | 6.3 % |
| Operating income | $  258 | $  273 | (5.5)% |
| Operating margin | 16.6% | 18.3% | |

192.    With respect to Raytheon's Missile Systems segment, which is now within the Company's Missiles & Defense segment, the 1Q19 10-Q provided the following:

**Missile Systems**

| (In millions, except percentages) | Three Months Ended | | |
| --- | --- | --- | --- |
| | Mar 31, 2019 | Apr 1, 2018 | % Change |
| Total net sales | $  2,006 | $  1,848 | 8.5 % |
| Total operating expenses | | | |
| Cost of sales—labor | 685 | 622 | 10.1 % |
| Cost of sales—materials and subcontractors | 883 | 826 | 6.9 % |
| Other cost of sales and other operating expenses | 248 | 188 | 31.9 % |
| Total operating expenses | 1,816 | 1,636 | 11.0 % |
| Operating income | $  190 | $  212 | (10.4)% |
| Operating margin | 9.5% | 11.5% | |

### *July 25, 2019 Form 10-Q*

193.    On July 25, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

194.    The 2Q19 10-Q stated the following regarding the Company's controls and procedures:

> ***Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of June 30, 2019 were effective.***

* * *

> ***Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the second quarter of 2019 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.***

(Emphasis added.)

195.    Pertaining to Raytheon's Integrated Defense Systems segment, which is now within the Company's Missiles & Defense segment, the 2Q19 10-Q provided the following:

**Integrated Defense Systems**

| (In millions, except percentages) | Three Months Ended | | | Six Months Ended | | |
|---|---|---|---|---|---|---|
| | Jun 30, 2019 | Jul 1, 2018 | % Change | Jun 30, 2019 | Jul 1, 2018 | % Change |
| Total net sales | $ 1,641 | $ 1,514 | 8.4% | $ 3,191 | $ 3,003 | 6.3 % |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 591 | 540 | 9.4% | 1,134 | 1,093 | 3.8 % |
| Cost of sales—materials and subcontractors | 545 | 478 | 14.0% | 1,048 | 944 | 11.0 % |
| Other cost of sales and other operating expenses | 241 | 234 | 3.0% | 487 | 431 | 13.0 % |
| Total operating expenses | 1,377 | 1,252 | 10.0% | 2,669 | 2,468 | 8.1 % |
| Operating income | $ 264 | $ 262 | 0.8% | $ 522 | $ 535 | (2.4)% |
| Operating margin | 16.1% | 17.3% | | 16.4% | 17.8% | |

196.    With respect to Raytheon's Missile Systems segment, which is now within the Company's Missiles & Defense segment, the 2Q19 10-Q provided the following:

**Missile Systems**

| (In millions, except percentages) | Three Months Ended | | | Six Months Ended | | |
|---|---|---|---|---|---|---|
| | Jun 30, 2019 | Jul 1, 2018 | % Change | Jun 30, 2019 | Jul 1, 2018 | % Change |
| Total net sales | $ 2,210 | $ 2,051 | 7.8 % | $ 4,216 | $ 3,899 | 8.1% |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 710 | 637 | 11.5 % | 1,395 | 1,259 | 10.8% |
| Cost of sales—materials and subcontractors | 971 | 888 | 9.3 % | 1,854 | 1,714 | 8.2% |
| Other cost of sales and other operating expenses | 276 | 295 | (6.4)% | 524 | 483 | 8.5% |
| Total operating expenses | 1,957 | 1,820 | 7.5 % | 3,773 | 3,456 | 9.2% |
| Operating income | $ 253 | $ 231 | 9.5 % | $ 443 | $ 443 | —% |
| Operating margin | 11.4% | 11.3% | | 10.5% | 11.4% | |

***October 24, 2019 Form 10-Q***

197.    On October 24, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 29, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

198.    The 3Q19 10-Q stated the following regarding the Company's controls and procedures:

> ***Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of September 29, 2019 were effective***.

> \* \* \*

> ***Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the third quarter of 2019 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting***.

(Emphasis added.)

199.    Pertaining to Raytheon's Integrated Defense Systems segment, which is now within the Company's Missiles & Defense segment, the 3Q19 10-Q provided the following:

**Integrated Defense Systems**

| (In millions, except percentages) | Three Months Ended | | | Nine Months Ended | | |
|---|---|---|---|---|---|---|
| | Sep 29, 2019 | Sep 30, 2018 | % Change | Sep 29, 2019 | Sep 30, 2018 | % Change |
| Total net sales | $ 1,755 | $ 1,493 | 17.5% | $ 4,946 | $ 4,496 | 10.0% |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 600 | 534 | 12.4% | 1,734 | 1,627 | 6.6% |
| Cost of sales—materials and subcontractors | 564 | 493 | 14.4% | 1,612 | 1,437 | 12.2% |
| Other cost of sales and other operating expenses | 309 | 225 | 37.3% | 796 | 656 | 21.3% |
| Total operating expenses | 1,473 | 1,252 | 17.7% | 4,142 | 3,720 | 11.3% |
| Operating income | $ 282 | $ 241 | 17.0% | $ 804 | $ 776 | 3.6% |
| Operating margin | 16.1% | 16.1% | | 16.3% | 17.3% | |

200. With respect to Raytheon's Missile Systems segment, which is now within the Company's Missiles & Defense segment, the 3Q19 10-Q provided the following:

**Missile Systems**

| (In millions, except percentages) | Three Months Ended | | | Nine Months Ended | | |
|---|---|---|---|---|---|---|
| | Sep 29, 2019 | Sep 30, 2018 | % Change | Sep 29, 2019 | Sep 30, 2018 | % Change |
| Total net sales | $ 2,165 | $ 2,082 | 4.0 % | $ 6,381 | $ 5,981 | 6.7 % |
| Total operating expenses | | | | | | |
| Cost of sales—labor | 721 | 638 | 13.0 % | 2,116 | 1,897 | 11.5 % |
| Cost of sales—materials and subcontractors | 939 | 915 | 2.6 % | 2,793 | 2,629 | 6.2 % |
| Other cost of sales and other operating expenses | 286 | 272 | 5.1 % | 810 | 755 | 7.3 % |
| Total operating expenses | 1,946 | 1,825 | 6.6 % | 5,719 | 5,281 | 8.3 % |
| Operating income | $ 219 | $ 257 | (14.8)% | $ 662 | $ 700 | (5.4)% |
| Operating margin | 10.1% | 12.3% | | 10.4% | 11.7% | |

***February 12, 2020 Form 10-K***

201. On February 12, 2020, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendants Kennedy, O'Brien, Wood, Atkinson, Beauchamp, Brown, Hadley, Long, Oliver, Paliwal, Pawlikowski, Spivey, Stewart, Winnefeld, and Work and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

202.    With respect to the Company's "Responsibility for Financial Statements," the 2019

10-K stated the following, in relevant part:

> The financial statements and related information contained in this Annual Report
> have been prepared by and are the responsibility of our management. Our financial
> statements have been prepared in conformity with accounting principles generally
> accepted in the United States of America and reflect judgments and estimates as to
> the expected effects of transactions and events currently being reported. Our
> management is responsible for the integrity and objectivity of the financial
> statements and other financial information included in this Annual Report. ***To meet
> this responsibility, we maintain a system of internal control over financial
> reporting to provide reasonable assurance that assets are safeguarded and that
> transactions are properly executed and recorded. The system includes policies
> and procedures, internal audits and our officers' reviews***.
>
> Our Audit Committee of our Board of Directors is composed solely of directors
> who are independent under applicable Securities and Exchange Commission (SEC)
> and New York Stock Exchange rules. Our Audit Committee meets periodically and,
> when appropriate, separately with representatives of the independent registered
> public accounting firm, our officers and the internal auditors to monitor the
> activities of each.

(Emphasis added.)

203.    In a section titled "Management Report on Internal Control Over Financial

Reporting," which was signed by Defendants Kennedy and O'Brien, the 2019 10-K stated the

following, in relevant part:

> Management is responsible for establishing and maintaining adequate internal
> control over financial reporting for the Company. In order to evaluate the
> effectiveness of internal control over financial reporting, as required by Section 404
> of the Sarbanes-Oxley Act, management has conducted an assessment, including
> testing, using the criteria in Internal Control – Integrated Framework, issued by the
> Committee of Sponsoring Organizations of the Treadway Commission (COSO) in
> 2013. The Company's system of internal control over financial reporting is
> designed to provide reasonable assurance regarding the reliability of financial
> reporting and the preparation of financial statements for external purposes in
> accordance with accounting principles generally accepted in the United States of
> America. . . .
>
> ***Based on its assessment, management has concluded that the Company
> maintained effective internal control over financial reporting as of December 31,***

> *2019, based on criteria in Internal Control – Integrated Framework, issued by the COSO in 2013.*

(Emphasis added.)

204.    The 2019 10-K stated the following regarding the Company's controls and procedures:

> *Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of December 31, 2019 were effective.*
>
> * * *
>
> *Changes in Internal Control Over Financial Reporting—There were no changes in our internal control over financial reporting during the fourth quarter of 2019 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.*

(Emphasis added.)

205.    Pertaining to Raytheon's Integrated Defense Systems segment and Missile Systems, which are now within the Company's Missiles & Defense segment, the 2019 10-K provided the following:

| Total Net Sales (in millions) | 2019 | 2018 | 2017 |
|---|---|---|---|
| Integrated Defense Systems | $ 6,927 | $ 6,180 | $ 5,804 |
| Intelligence, Information and Services | 7,151 | 6,722 | 6,177 |
| Missile Systems | 8,726 | 8,298 | 7,787 |
| Space and Airborne Systems | 7,427 | 6,748 | 6,430 |
| Forcepoint | 658 | 634 | 608 |
| Eliminations | (1,712) | (1,514) | (1,423) |
| Total business segment sales | 29,177 | 27,068 | 25,383 |
| Acquisition Accounting Adjustments | (1) | (10) | (35) |
| Total | $ 29,176 | $ 27,058 | $ 25,348 |

* * *

| Intersegment Sales (in millions) | | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 87 | $ | 65 | $ | 64 |
| Intelligence, Information and Services | | 700 | | 666 | | 666 |
| Missile Systems | | 210 | | 161 | | 132 |
| Space and Airborne Systems | | 686 | | 596 | | 540 |
| Forcepoint | | 29 | | 26 | | 21 |
| Total | $ | 1,712 | $ | 1,514 | $ | 1,423 |

| Operating Income (in millions) | | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 1,111 | $ | 1,023 | $ | 935 |
| Intelligence, Information and Services[1] | | 658 | | 538 | | 455 |
| Missile Systems | | 959 | | 973 | | 1,010 |
| Space and Airborne Systems | | 991 | | 884 | | 862 |
| Forcepoint | | 8 | | 5 | | 33 |
| Eliminations | | (184) | | (170) | | (148) |
| Total business segment operating income | | 3,543 | | 3,253 | | 3,147 |
| Acquisition Accounting Adjustments | | (112) | | (126) | | (160) |
| FAS/CAS Operating Adjustment | | 1,454 | | 1,428 | | 1,303 |
| Corporate and Reclassification[1][2] | | (111) | | (17) | | (59) |
| Total | $ | 4,774 | $ | 4,538 | $ | 4,231 |

* * *

| Intersegment Operating Income (in millions) | | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 8 | $ | 6 | $ | 5 |
| Intelligence, Information and Services | | 68 | | 68 | | 64 |
| Missile Systems | | 20 | | 15 | | 13 |
| Space and Airborne Systems | | 67 | | 60 | | 51 |
| Forcepoint | | 21 | | 21 | | 15 |
| Total | $ | 184 | $ | 170 | $ | 148 |

* * *

| Capital Expenditures (in millions) | | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 309 | $ | 242 | $ | 200 |
| Intelligence, Information and Services | | 50 | | 46 | | 22 |
| Missile Systems | | 232 | | 337 | | 221 |
| Space and Airborne Systems | | 304 | | 136 | | 158 |
| Forcepoint | | 17 | | 13 | | 14 |
| Corporate | | 28 | | 24 | | 19 |
| Total[1] | $ | 940 | $ | 798 | $ | 634 |

(1)   Total capital expenditures may not agree to our consolidated statements of cash flows due to non-cash transactions.

| Depreciation and Amortization (in millions) | | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Integrated Defense Systems | $ | 118 | $ | 98 | $ | 98 |
| Intelligence, Information and Services | | 49 | | 51 | | 50 |
| Missile Systems | | 129 | | 98 | | 84 |
| Space and Airborne Systems | | 132 | | 140 | | 132 |
| Forcepoint | | 14 | | 17 | | 17 |
| Acquisition Accounting Adjustments | | 111 | | 116 | | 125 |
| Corporate | | 52 | | 48 | | 44 |
| Total | $ | 605 | $ | 568 | $ | 550 |

### *July 29, 2020 Form 10-Q*

206.    On July 29, 2020, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2020 (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendants O'Brien and Wood and contained SOX certifications signed by non-party Hayes and Defendant O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

207.    The 2Q20 10-Q stated the following regarding the Company's controls and procedures:

> On April 3, 2020, we completed the Raytheon Merger and prior to the merger, we completed the Separation Transactions. ***We have incorporated Raytheon's controls to the extent that they are better suited for Raytheon's operations and extended our oversight and monitoring processes that support our internal control over financial reporting to include Raytheon's operations***. We are continuing to integrate the operations of Raytheon into our overall internal control over financial reporting process. ***There has been no other change in our internal control over financial reporting during the quarter ended June 30, 2020 that has***

***materially affected, or is reasonably likely to materially affect, our internal control over financial reporting***.

(Emphasis added.)

208.     Pertaining to Raytheon's Missiles & Defense segment, the 2Q20 10-Q provided the following:

**Raytheon Missiles & Defense**

| (dollars in millions) | | Quarter Ended June 30, | | | | Six Months Ended June 30, | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2020 | 2019 | Change | | 2020 | 2019 | Change |
| Net Sales | $ | 3,590 | — | NM | $ | 3,590 | — | NM |
| Operating Profits | | 397 | — | NM | | 397 | — | NM |
| Operating Profit Margins | | 11.1 % | — | | | 11.1 % | — | |
| Bookings | $ | 4,305 | — | NM | $ | 4,305 | — | NM |

NM = Not meaningful

209.     The statements referenced in ¶¶116-159, 166-182, and 189-208, herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company failed to maintain adequate disclosure controls and procedures and failed to maintain internal controls over financial reporting; (2) the Company's financial accounting methods were defective; (3) consequently, the Company failed to appropriately report Raytheon's expenditures relating to the Company's Missiles & Defense business since, at least, 2009; (4) accordingly, the Company was subjected to a heightened risk for governmental scrutiny; and (5) thus, the DOJ would commence a criminal investigation into Raytheon. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## **The Truth Emerges**

210.     On October 27, 2020, the Company filed its 3Q20 10-Q which revealed that Raytheon had received a criminal subpoena in connection with the DOJ Investigation, stating, in relevant part, as follows:

> ***On October 8, 2020, the Company received a criminal subpoena from the DOJ*** seeking information and documents in connection with ***an investigation relating to financial accounting, internal controls over financial reporting, and cost reporting regarding Raytheon Company's Missiles & Defense business since 2009***. We are cooperating fully with the DOJ's investigation. At this time, the Company is unable to predict the outcome of the investigation. Based on the information available to date, however, we do not believe the results of this inquiry will have a material adverse effect on our financial condition, results of operations or liquidity.

(Emphasis added.)

211.    On this news, the price of the Company's stock fell $4.19 per share, or over 7.4%, from $56.53 per share at the close of trading on October 27, 2020, to $52.34 per share at the close of trading on October 28, 2020.

## Repurchases During the Relevant Period

212.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $4.0 billion to repurchase approximately 24,263,696 shares of its own common stock at artificially inflated prices from February 2016 through December 2019.[13]

213.    According to the 1Q16 10-Q, between February 1, 2016 and February 28, 2016, the Company purchased 1,448,810 shares of its common stock for approximately $179,362,678, at an average price of $123.80 per share.[14]

214.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $103,531,963 for repurchases of its own stock between February 1, 2016 and February 28, 2016.

---

[13] These shares include shares repurchased to satisfy tax withholding obligations related to employee stock options and the vesting of restricted stock issued to employees.
[14] Upon information and belief, these shares were repurchased during the Relevant Period.

215.    According to the 1Q16 10-Q, between February 29, 2016 and April 3, 2016, the Company purchased 1,786,136 shares of its common stock for approximately $220,873,578 at an average price of $123.66 per share.

216.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $127,387,220 for repurchases of its own stock between February 29, 2016 and April 3, 2016.

217.    According to the 2Q16 10-Q, between May 2, 2016 and May 29, 2016, the Company purchased 647,519 shares of its common stock for approximately $82,947,184 at an average price of $128.10 per share.

218.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $49,056,039 for repurchases of its own stock between May 2, 2016 and May 29, 2016.

219.    According to the 2Q16 10-Q, between May 30, 2016 and June 3, 2016, the Company purchased 1,304,946 shares of its common stock for approximately $171,600,399 at an average price of $131.50 per share.

220.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $103,299,525 for repurchases of its own stock between May 30, 2016 and June 3, 2016.

221.    According to the 3Q16 10-Q, between July 4, 2016 and July 31, 2016, the Company purchased 8,177 shares of its common stock for approximately $1,108,719 at an average price of $135.59 per share.

222.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $680,735 for repurchases of its own stock between July 4, 2016 and July 31, 2016.

223.    According to the 3Q16 10-Q, between August 1, 2016 and August 28, 2016, the Company purchased 1,238,004 shares of its common stock for approximately $175,004,245 at an average price of $141.36 per share.

224.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $110,207,116 for repurchases of its own stock between August 1, 2016 and August 28, 2016.

225.    According to the 3Q16 10-Q, between August 29, 2016 and October 2, 2016, the Company purchased 171,930 shares of its common stock for approximately $23,520,024 at an average price of $136.80 per share.

226.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $14,521,208 for repurchases of its own stock between August 29, 2016 and October 2, 2016.

227.    According to the 2016 10-K, between October 3, 2016 and October 30, 2016, the Company purchased 1,004 shares of its common stock for approximately $137,719 at an average price of $137.17 per share.

228.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $85,169 for repurchases of its own stock between October 3, 2016 and October 30, 2016.

229.     According to the 2016 10-K, between October 31, 2016 and November 27, 2016, the Company purchased 289,261 shares of its common stock for approximately $39,108,087 at an average price of $135.20 per share.

230.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $23,968,166 for repurchases of its own stock between October 31, 2016 and November 27, 2016.

231.     According to the 2016 10-K, between November 28, 2016 and December 31, 2016, the Company purchased 422,974 shares of its common stock for approximately $60,671,391 at an average price of $143.44 per share.

232.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $38,532,931 for repurchases of its own stock between November 28, 2016 and December 31, 2016.

233.     According to the 1Q17 10-Q, between January 1, 2017 and January 29, 2017, the Company purchased 7,799 shares of its common stock for approximately $1,136,314 at an average price of $145.70 per share.

234.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $728,115 for repurchases of its own stock between January 1, 2017 and January 29, 2017.

235.     According to the 1Q17 10-Q, between January 30, 2017 and February 26, 2017, the Company purchased 2,671,987 shares of its common stock for approximately $400,023,174 at an average price of $149.71 per share.

236.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $260,171,374 for repurchases of its own stock between January 30, 2017 and February 26, 2017.

237.     According to the 1Q17 10-Q, between February 27, 2017 and April 2, 2017, the Company purchased 97,621 shares of its common stock for approximately $15,219,114 at an average price of $155.90 per share.

238.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $10,109,631 for repurchases of its own stock between February 27, 2017 and April 2, 2017.

239.     According to the 2Q17 10-Q, between April 3, 2017 and April 30, 2017, the Company purchased 29 shares of its common stock for approximately $4,386 at an average price of $151.23 per share.

240.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $2,868 for repurchases of its own stock between April 3, 2017 and April 30, 2017.

241.     According to the 2Q17 10-Q, between May 1, 2017 and May 28, 2017, the Company purchased 81,894 shares of its common stock for approximately $13,050,627 at an average price of $159.36 per share.

242.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $8,764,296 for repurchases of its own stock between May 1, 2017 and May 28, 2017.

243.     According to the 2Q17 10-Q, between May 29, 2017 and July 2, 2017, the Company purchased 790,944 shares of its common stock for approximately $123,447,945 at an average price of $162.23 per share.

244.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $83,620,136 for repurchases of its own stock between May 29, 2017 and July 2, 2017.

245.     According to the 3Q17 10-Q, between July 3, 2017 and July 30, 2017, the Company purchased 5,690 shares of its common stock for approximately $964,171 at an average price of $169.45 per share.

246.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $666,356 for repurchases of its own stock between July 3, 2017 and July 30, 2017.

247.     According to the 3Q17 10-Q, between July 31, 2017 and August 27, 2017, the Company purchased 242,583 shares of its common stock for approximately $42,000,821 at an average price of $173.14 per share.

248.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $29,304,026 for repurchases of its own stock between July 31, 2017 and August 27, 2017.

249.     According to the 3Q17 10-Q, between August 28, 2017 and October 1, 2017, the Company purchased 879,846 shares of its common stock for approximately $159,920,809 at an average price of $181.76 per share.

250.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $113,869,669 for repurchases of its own stock between August 28, 2017 and October 1, 2017.

251.    According to the 2017 10-K, between October 2, 2017 and October 29, 2017, the Company purchased 21 shares of its common stock for approximately $3,941 at an average price of $187.65 per share.

252.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $2,842 for repurchases of its own stock between October 2, 2017 and October 29, 2017.

253.    According to the 2017 10-K, between October 30, 2017 and November 26, 2017, the Company purchased 316,108 shares of its common stock for approximately $57,961,563 at an average price of $183.36 per share.

254.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $41,416,470 for repurchases of its own stock between October 30, 2017 and November 26, 2017.

255.    According to the 2017 10-K, between November 27, 2017 and December 31, 2017, the Company purchased 225,323 shares of its common stock for approximately $42,277,354 at an average price of $187.63 per share.

256.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $30,483,949 for repurchases of its own stock between November 27, 2017 and December 31, 2017.

257.     According to the 1Q18 10-Q, between January 1, 2018 and January 28, 2018, the Company purchased 3,335 shares of its common stock for approximately $660,330 at an average price of $198.00 per share.

258.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $485,776 for repurchases of its own stock between January 1, 2018 and January 28, 2018.

259.     According to the 1Q18 10-Q, between January 29, 2018 and February 25, 2018, the Company purchased 1,842,346 shares of its common stock for approximately $382,323,642 at an average price of $207.52 per share.

260.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $285,895,252 for repurchases of its own stock between January 29, 2018 and February 25, 2018.

261.     According to the 1Q18 10-Q, between February 26, 2018 and April 1, 2018, the Company purchased 251,058 shares of its common stock for approximately $53,676,200 at an average price of $213.80 per share.

262.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $40,535,825 for repurchases of its own stock between February 26, 2018 and April 1, 2018.

263.     According to the 2Q18 10-Q, between April 30, 2018 and May 27, 2018, the Company purchased 791,712 shares of its common stock for approximately $163,797,296 at an average price of $206.89 per share.

264.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $122,359,090 for repurchases of its own stock between April 30, 2018 and May 27, 2018.

265.     According to the 2Q18 10-Q, between May 28, 2018 and July 1, 2018, the Company purchased 1,200,170 shares of its common stock for approximately $252,119,712 at an average price of $210.07 per share.

266.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $189,302,814 for repurchases of its own stock between May 28, 2018 and July 1, 2018.

267.     According to the 3Q18 10-Q, between July 2, 2018 and July 29, 2018, the Company purchased 1,003 shares of its common stock for approximately $196,782 at an average price of $196.14 per share.

268.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $144,231 for repurchases of its own stock between July 2, 2018 and July 29, 2018.

269.     According to the 3Q18 10-Q, between July 30, 2018 and August 26, 2018, the Company purchased 318,140 shares of its common stock for approximately $62,504,966 at an average price of $196.47 per share.

270.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $45,853,518 for repurchases of its own stock between July 30, 2018 and August 26, 2018.

271.    According to the 3Q18 10-Q, between August 27, 2018 and September 30, 2018, the Company purchased 313,890 shares of its common stock for approximately $62,630,472 at an average price of $199.53 per share.

272.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $46,201,469 for repurchases of its own stock between August 27, 2018 and September 30, 2018.

273.    According to the 2018 10-K, between October 1, 2018 and October 28, 2018, the Company purchased 241 shares of its common stock for approximately $49,665 at an average price of $206.08 per share.

274.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $37,051 for repurchases of its own stock between October 1, 2018 and October 28, 2018.

275.    According to the 2018 10-K, between October 29, 2018 and November 25, 2018, the Company purchased 1,339,112 shares of its common stock for approximately $240,477,733 at an average price of $179.58 per share.

276.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $170,388,611 for repurchases of its own stock between October 29, 2018 and November 25, 2018.

277.    According to the 2018 10-K, between November 26, 2018 and December 31, 2018, the Company purchased 936,757 shares of its common stock for approximately $159,960,625 at an average price of $170.76 per share.

278.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $110,930,764 for repurchases of its own stock between November 26, 2018 and December 31, 2018.

279.    According to the 1Q19 10-Q, between January 1, 2019 and January 27, 2019, the Company purchased 508 shares of its common stock for approximately $85,415 at an average price of $168.14 per share.

280.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $58,826 for repurchases of its own stock between January 1, 2019 and January 27, 2019.

281.    According to the 1Q19 10-Q, between January 28, 2019 and February 24, 2019, the Company purchased 2,219,430 shares of its common stock for approximately $400,007,869 at an average price of $180.23 per share.

282.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $283,842,903 for repurchases of its own stock between January 28, 2019 and February 24, 2019.

283.    According to the 1Q19 10-Q, between February 25, 2019 and March 31, 2019, the Company purchased 768,502 shares of its common stock for approximately $139,083,492 at an average price of $180.98 per share.

284.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $98,860,097 for repurchases of its own stock between February 25, 2019 and March 31, 2019.

285.     According to the 2Q19 10-Q, between April 1, 2019 and April 28, 2019, the Company purchased 983,505 shares of its common stock for approximately $178,988,075 at an average price of $181.99 per share.

286.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $127,511,423 for repurchases of its own stock between April 1, 2019 and April 28, 2019.

287.     According to the 2Q19 10-Q, between April 29, 2019 and May 26, 2019, the Company purchased 622,266 shares of its common stock for approximately $111,024,700 at an average price of $178.42 per share.

288.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $78,455,297 for repurchases of its own stock between April 29, 2019 and May 26, 2019.

289.     According to the 2Q19 10-Q, between May 27, 2019 and June 30, 2019, the Company purchased 58,166 shares of its common stock for approximately $10,391,938 at an average price of $178.66 per share.

290.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $7,347,529 for repurchases of its own stock between April 29, 2019 and May 26, 2019.

291.     According to the 3Q19 10-Q, between July 1, 2019 and July 28, 2019, the Company purchased 2,041 shares of its common stock for approximately $375,809 at an average price of $184.13 per share.

292.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $268,983 for repurchases of its own stock between July 1, 2019 and July 28, 2019.

293.    According to the 3Q19 10-Q, between August 26, 2019 and September 29, 2019, the Company purchased 1,296 shares of its common stock for approximately $255,480 at an average price of $197.13 per share.

294.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $187,648 for repurchases of its own stock between August 26, 2019 and September 29, 2019.

295.    According to the 2019 10-K, between September 30, 2019 and October 27, 2019, the Company purchased 10 shares of its common stock for approximately $1,956 at an average price of $195.64 per share.

296.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $1,433 for repurchases of its own stock between September 30, 2019 and October 27, 2019.

297.    According to the 2019 10-K, between October 28, 2019 and November 24, 2019, the Company purchased 928 shares of its common stock for approximately $201,877 at an average price of $217.54 per share.

298.    As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $153,306 for repurchases of its own stock between October 28, 2019 and November 24, 2019.

299.     According to the 2019 10-K, between November 25, 2019 and December 31, 2019, the Company purchased 674 shares of its common stock for approximately $145,442 at an average price of $215.79 per share.

300.     As the Company's stock was actually worth only $52.34 per share, the price at closing on October 28, 2020, the Company overpaid by approximately $110,165 for repurchases of its own stock between November 25, 2019 and December 31, 2019.

301.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $2.7 billion.

## **DAMAGES TO RAYTHEON**

302.     As a direct and proximate result of the Individual Defendants' conduct, Raytheon will lose and expend many millions of dollars.

303.     Such losses include nearly $2.7 billion the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

304.     Such expenditures include, but are not limited to, legal fees associated with the SEC Investigation, the DOJ Investigation, the Securities Class Action filed against the Company, its Executive Chairman and former CEO, its CFO, and its Corporate Vice President and Controller and former CAO, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

305.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

306.     As a direct and proximate result of the Individual Defendants' conduct, Raytheon has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

307.     Plaintiff brings this action derivatively and for the benefit of Raytheon to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Raytheon, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, as well as the aiding and abetting thereof.

308.     Raytheon is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

309.     Plaintiff is, and has been at all relevant times, a shareholder of Raytheon. Plaintiff will adequately and fairly represent the interests of Raytheon in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

310.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

311.     A pre-suit demand on the Board of Raytheon is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following fifteen individuals: Defendants Kennedy, Atkinson, Oliver, Paliwal, Pawlikowski, Winnefeld, and Work (the

"Director-Defendants"), along with non-parties Hayes, Kelly Ortberg, Lloyd J. Austin III, Marshall O. Larsen, Margaret L. O'Sullivan, Denise L. Ramos, Fredric G. Reynolds, and Brian C. Rogers (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to eight of the fifteen Directors that were on the Board at the time of the filing of this complaint.

312.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to engage in improper accounting practices and to make and/or cause the Company to make false and misleading statements and omissions of material fact, while two of them engaged in insider sales based on material non-public information, and, at the same time, to cause the Company to overpay by nearly $2.7 billion for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

313.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to engage in improper accounting practices and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the fraud perpetrated by the Individual Defendants, one of the Director-Defendants sold Company stock at artificially inflated prices based on inside information. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

314.    Additional reasons that demand on Defendant Kennedy is futile follow. Defendant Kennedy has served as the Company's Executive Chairman since the Merger in April 2020. He also serves as a member of the Finance Committee and as a member of the Special Activities Committee. Prior to the Merger, he had served as the Company's CEO since 2014, Chairman since October 2014, and as a director since January 2014. Previously, he served in various leadership roles at the Company including as the Company's Executive Vice President and COO from April 2013 until March 2014, Vice President and President of the Integrated Defense Systems business unit from 2010 until 2013, Vice President of the Tactical Airborne Systems product line within the Company's Space and Airborne Systems business unit from 2007 until 2010. Thus, as the Company recognizes, he is a non-independent director. The Company provides Defendant Kennedy with his principal occupation, and he receives and has received handsome compensation, including $16,561,765 during 2019 for his services. Defendant Kennedy was ultimately responsible for many of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made and/or signed SOX certifications for, including the 2015, 2016, 2017, 2018, and 2019 10-Ks. As the Company's highest officer during the Relevant Period and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded over $23.6 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Kennedy is a defendant in the Securities Class Action. For these reasons,

Defendant Kennedy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

315.    Additional reasons that demand on Defendant Atkinson is futile follow. Defendant Atkinson has served as a Company director since 2014. She also serves as the Chair of the Compensation Committee and as a member of the Audit and Finance Committees. Defendant Atkinson has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Atkinson signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. Her insider sale, which yielded over $107,000 in proceeds, demonstrates her motive in facilitating and participating in the fraud. For these reasons, Defendant Atkinson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

316.    Additional reasons that demand on Defendant Oliver is futile follow. Defendant Oliver has served as a Company director since 2013. He also serves as a member of the Company's Governance and Public Policy Committee and as a member of the Finance Committee. Previously, he also served as a member of the Executive Committee. Defendant Oliver has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously

disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Oliver signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Oliver breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

317.    Additional reasons that demand on Defendant Paliwal is futile follow. Defendant Paliwal has served as the Company's Lead Director since the Merger in April 2020. He also serves as a member of the Governance and Public Policy Committee and as a member of the Compensation Committee. Prior to the Merger, Defendant Paliwal had served as a Company director from 2016 until April 2020. He also served as the Chair of the Governance and Nominating Committee and as a member of the Public Policy and Corporate Responsibility Committee. Defendant Paliwal has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Paliwal signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Paliwal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

318.    Additional reasons that demand on Defendant Pawlikowski is futile follow. Defendant Pawlikowski has served as a Company director since July 2007. She also serves as a

member of the Company's Audit Committee. Defendant Pawlikowski has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Pawlikowski signed, and thus personally made the false and misleading statements in the 2018, and 2019 10-Ks. For these reasons, Defendant Pawlikowski breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

319.    Additional reasons that demand on Defendant Winnefeld is futile follow. Defendant Winnefeld has served as a Company director since the Merger in April 2020. He also serves as the Chair of the Special Activities Committee and as a member of the Compensation Committee and as a member of the Finance Committee. Prior to the Merger, Defendant Winnefeld served as a Company director from 2017 until April 2020. He also served as the Chair of the Special Activities Committee, as a member of the Finance Committee, and as a member of the Compensation Committee. Defendant Winnefeld has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Winnefeld signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-

Ks. For these reasons, Defendant Winnefeld breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

320.    Additional reasons that demand on Defendant Work is futile follow. Defendant Work has served as a Company director since the Merger in April 2020. He also serves as the Chair of the Governance and Public Policy Committee, as a member of the Audit Committee, and as a member of the Special Activities Committee. Prior to the Merger, Defendant Work served as a Company director from 2017 until April 2020. He also served a member of the Audit Committee, Public Policy and Corporate Responsibility Committee, and as a member of the Special Activities Committee. Defendant Work has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Work signed, and thus personally made the false and misleading statements in the 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Work breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

321.    Demand is also futile as to non-party Hayes. Hayes has served as the Company's President and CEO and as a Company director since the Merger in April 2020. He also serves as a member of the Finance Committee and as a member of the Special Activities Committee. Thus, as the Company admits, he is a non-independent director. The Company provides Hayes with his principal occupation, and he receives handsome compensation, including $21,538,847 during 2019

for his services. He is thus beholden to the Director-Defendants, who have influence over his compensation and continued employment at the Company. As such, he is not independent or disinterested, and demand upon him is futile and, therefore, excused.

322.    Additional reasons that demand on the Board is futile follow.

323.    Each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by billions of dollars for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

324.    As described above, two of the Director-Defendants directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Defendant Kennedy received proceeds of over $23.6 million and Defendant Atkinson received over $107,000 as a result of insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

325.    The Directors have extensive, longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance: (1) Defendants Kennedy and Beauchamp, have served on the Board of Forcepoint, LLC together since 2016; (2) Defendants Brown and Paliwal have served on the Board of Harman International Industries, Inc. together from 2013 until 2017; (3) Defendant Hadley and non-party Margaret L. O'Sullivan currently serve

on the Board of the Council on Foreign Relations while Defendant Work serves as a member of the organization; and (4) Defendant Paliwal served on the Board of Tyco International Ltd. from 2011 until 2012 while Defendant Oliver served as its President during that time. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

326.    Defendants Atkinson, Pawlikowski, and Work (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee is responsible for overseeing, among other things, the Company's accounting and financial reporting principles and policies, the Company's financial statements, and the performance of the Company's internal audit function. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes, as they are charged to do under the Audit Committee Charter, allowing the Company to engage in improper accounting practices, to file false and misleading financial statements with the SEC, and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

327.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to engage in improper accounting practices, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act.  In violation of the Code of Conduct,

the Director-Defendants engaged in improper insider selling, failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

328.    Raytheon has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Raytheon any part of the damages Raytheon suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

329.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

330.    The acts complained of herein constitute violations of fiduciary duties owed by Raytheon's officers and directors, and these acts are incapable of ratification.

331.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Raytheon. If there is a directors' and officers'

liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Raytheon, there would be no directors' and officers' insurance protection.  Accordingly, the Director-Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

332.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Raytheon to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

333.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least eight of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934

334.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

335.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

336.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

337.    Under the direction and watch of the directors, the 2018 and 2019 (the "Proxy Statements") failed to disclose that: (1) the Company failed to maintain adequate disclosure controls and procedures and failed to maintain internal controls over financial reporting; (2) the Company's financial accounting methods were defective; (3) consequently, the Company failed to appropriately report Raytheon's expenditures relating to the Company's Missiles & Defense business since, at least, 2009; (4) accordingly, the Company was subjected to a heightened risk for governmental scrutiny; and (5) thus, the DOJ would commence a criminal investigation into Raytheon.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

338.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

339.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their causing the Company to engage in improper accounting practices and issue false and misleading statements and/or omissions of material fact.

340.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, advisory approval of the Proposals.

341.    The misrepresentations and omissions set forth herein were material to shareholders in voting on the Proposals who would not have, among other things, approved Defendants Kennedy, Atkinson, Beauchamp, Brown, Clark, Hadley, Long, Oliver, Paliwal, Pawlikowski, Spivey, Stewart, Winnefeld, and Work incentive award plan, had they been informed that the Individual Defendants caused the Company to engage in improper accounting practices, which are the subject of the DOJ Investigation and SEC Investigation. As a result of shareholder approval of the incentive proposal, Defendants Kennedy and O'Brien undeservedly received approximately $15,020,901 and $4,612,400, respectively, in performance-based stock awards during the fiscal year ended December 31, 2019; and Defendants Atkinson, Beauchamp, Brown, Clark, Hadley, Long, Oliver, Paliwal, Pawlikowski, Stewart, Winnenfeld, and Work, undeservedly received approximately $154,914 each in stock awards during the fiscal year ended December 31, 2019;

and Defendants Spivey undeservedly received approximately $206,082, respectively in stock awards during the fiscal year ended December 31, 2019.

342.    The false and misleading elements of the Proxy Statements led to the election and/or re-election of Defendants Kennedy, Atkinson, Beauchamp, Brown, Clark, Hadley, Long, Oliver, Paliwal, Pawlikowski, Spivey, Stewart, Winnefeld, and Work, which allowed them to continue breaching their fiduciary duties to Raytheon.

343.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

344.    Plaintiff on behalf of Raytheon has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of
### Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

345.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

346.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Raytheon. Not only is Raytheon now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Raytheon by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially-inflated prices, damaging Raytheon.

347.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify

the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

348.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Raytheon not misleading.

349.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Raytheon.

350.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

351.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving

as a director made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

352.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

353.    Plaintiff on behalf of Raytheon has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a)
of the Securities Exchange Act of 1934**

354.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

355.    The Individual Defendants, by virtue of their positions with Raytheon and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Raytheon and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Raytheon to engage in the illegal conduct and practices complained of herein.

356.    Plaintiff on behalf of Raytheon has no adequate remedy at law.

### FOURTH CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

357.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

358.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Raytheon's business and affairs.

359.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

360.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Raytheon.

361.    In breach of their fiduciary duties owed to Raytheon, the Individual Defendants willfully or recklessly caused the Company to engage in improper accounting practices, and made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company failed to maintain adequate disclosure controls and procedures and failed to maintain internal controls over financial reporting; (2) the Company's financial accounting methods were defective; (3) consequently, the Company failed to appropriately report Raytheon's expenditures relating to the Company's Missiles & Defense business since, at least, 2009; (4) accordingly, the Company was subjected to a heightened risk for governmental scrutiny; and (5) thus, the DOJ would commence a criminal investigation into Raytheon. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

362.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

363.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

364.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares

of its own common stock at artificially inflated prices before the fraud was exposed, while seven of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $37.6 million.

365.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Raytheon's securities and disguising insider sales.

366.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Raytheon's securities and disguising insider sales.

367.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

368.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Raytheon has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

369.     Plaintiff on behalf of Raytheon has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

370.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

371.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Raytheon.

372.     The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Raytheon that was tied to the performance or artificially inflated valuation of Raytheon, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

373.     Plaintiff, as a shareholder and a representative of Raytheon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

374.     Plaintiff on behalf of Raytheon has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

375.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

376.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Raytheon, for which they are legally responsible.

377.    As a direct and proximate result of the Individual Defendants' abuse of control, Raytheon has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Raytheon has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

378.    Plaintiff on behalf of Raytheon has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

379.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

380.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Raytheon in a manner consistent with the operations of a publicly-held corporation.

381.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Raytheon has sustained and will continue to sustain significant damages.

382.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

383.    Plaintiff on behalf of Raytheon has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

384.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

385.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

386.    In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

387.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

388.    Plaintiff on behalf of Raytheon has no adequate remedy at law.

## NINTH CLAIM

### Against Defendants Kennedy, O'Brien, and Wood for Contribution Under Sections 10(b) and 21D of the Exchange Act

389.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

390.    Raytheon, along with Defendants Kennedy, O'Brien, and Wood are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws

for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Kennedy, O'Brien, and Wood's willful and/or reckless violations of their obligations as officers and/or directors of Raytheon.

391. Defendants Kennedy, O'Brien, and Wood, because of their positions of control and authority as officers and/or directors of Raytheon, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Raytheon, including the wrongful acts complained of herein and in the Securities Class Action.

392. Accordingly, Defendants Kennedy, O'Brien, and Wood are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

393. As such, Raytheon is entitled to receive all appropriate contribution or indemnification from Defendants Kennedy, O'Brien, and Wood.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Raytheon, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Raytheon;

(c) Determining and awarding to Raytheon the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and

severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Raytheon and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Raytheon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Raytheon to nominate at least eight candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Raytheon restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: November 25, 2020

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
        mfarnan@farnanlaw.com

Of Counsel:

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net